[This opinion has been published in *Ohio Official Reports* at 81 Ohio St.3d 628.]

SOPKOVICH, ADMR., APPELLEE, *v.* OHIO EDISON COMPANY, APPELLANT.

[Cite as *Sopkovich v. Ohio Edison Co.*, 1998-Ohio-341.]

*Torts—Negligence—Independent contractor—For purposes of determining when a property owner owes a duty of care to an employee of an independent contractor, the property owner "actively participates" in the performance of the employee's work when the property owner exercises exclusive control over an aspect of the employee's working environment.*

(No. 97-317—Submitted February 3, 1998—Decided May 13, 1998.)

CERTIFIED by the Court of Appeals for Trumbull County, No. 96-T-5384.

————————————

{¶ 1} On July 15, 1987, Michael J. Lexie, then an employee of Morakis Sons Industrial Painting Company, Inc. ("Morakis Sons"), sustained severe injuries when he came into contact with high voltage electricity while painting an electric substation owned and operated by the Ohio Edison Company, appellant. Ohio Edison had hired Morakis Sons, an independent contractor, to perform the painting work. The accident occurred at Ohio Edison's electric substation in Masury, Ohio. The following relevant matters can be gleaned from the record.

{¶ 2} In March 1987, Morakis Sons entered into an agreement with Ohio Edison to paint steel structures at Ohio Edison's electric substation in Masury. The terms of the agreement required Morakis Sons to "furnish all labor, supervision, tools, equipment of every sort, temporary structures and all materials for temporary use and not to be permanently applied to Edison's structures in the course of the painting." The agreement also provided that Morakis Sons was to assume full responsibility for the work and the conduct of its employees, and that "[d]irections and instructions shall be given to labor only by [Morakis Sons] or its representatives, and in no circumstances by Edison or its representatives."

**{¶ 3}** The Masury substation was a "transmission" substation through which high voltage electricity flowed. The record indicates that it was not feasible to shut off the entire flow of electricity through the substation during the period in which Morakis Sons was to perform the painting work. Specifically, the record indicates that to shut down the entire flow of electricity through the substation would have resulted in a loss of power to thousands of Ohio Edison customers. However, Ohio Edison was able to stop the flow of electricity through certain conductors in some areas of the substation without interrupting service to its customers.

**{¶ 4}** Morakis Sons began painting the steel structures at the Masury substation in July 1987. Patrick Campbell was Ohio Edison's on-site representative. James Morakis ("Morakis"), the president of Morakis Sons, was the supervisor of the painting crew. Each day, prior to the commencement of the painting work, Campbell would confer with Morakis, in the presence of the painters, to inform him which conductors were "hot" (energized) and which had been de-activated. Morakis would then convey or repeat that information to the painters. After informing Morakis of the energized and de-energized areas, Campbell would remain at the substation to answer questions and to ensure that the painting work was properly completed. Campbell would also occasionally speak directly to the painters, but these conversations were generally limited to the topic of which electrical lines or circuits were active and which had been de-energized.

**{¶ 5}** At all relevant times, Ohio Edison retained exclusive control over the determination of which electrical circuits or lines would be de-energized at the substation. Ohio Edison also retained exclusive control over the process of activating and de-activating the lines. Apparently, whenever Morakis Sons finished painting an area or section that had been de-energized, Ohio Edison would execute "switching orders" to totally or partially de-energize the next area or section in which the painting work was to be completed. When this occurred, Campbell

would inform Morakis of the areas that were de-energized, and Morakis would then apprise the painting crew of the areas in which it was safe to paint. At all times, Morakis remained on the job site to direct and supervise the work of the painting crew and to ensure that the members of his crew did not stray into energized areas.

{¶ 6} On July 15, 1987, the day of the accident, Morakis instructed Lexie, an employee of Morakis Sons, to paint certain I-beams that were located approximately thirty to forty feet off the ground. By early afternoon, Lexie had completed the assigned task and began to descend from the structure. While making his way down the structure, Lexie received a massive electrical shock, causing him to fall from the structure to the ground. In a deposition taken January 22, 1990, Lexie could not recall precisely how the accident occurred, but testified that "I come off an I-beam and I think I was crawling to my left on this box trying to get down again and then the next thing I know I'm on the ground." Lexie testified that he never came into contact with any electrical line, and that the electricity had simply "reached out and touched me." Lexie claimed that there were "hot" wires all around him in the area where he was working on the day of the accident, and that he had complained to Campbell and to Morakis prior to the accident that the area was dangerous. However, according to Lexie, Morakis had instructed him to get back to work. Lexie testified further that he had asked Campbell prior to the accident whether there were any warning flags that could be hung from the electrical lines to help the painters distinguish between the "hot" (energized) and "cold" (de-energized) areas, but that Campbell had stated that there were no flags at the Masury substation.

{¶ 7} Morakis was watching Lexie moments before the accident occurred. According to Morakis, Lexie was nowhere near an energized area at the time Morakis was watching him. However, in the seconds preceding the accident, Morakis turned to check on the location of his other painters. At that moment, Morakis heard a "bang," saw a "flash," and then turned back to see that Lexie had

fallen to the ground. In an April 1991 deposition, Morakis testified that "[i]t was de-energized where he was working and he just finished up and I happened to be— I was right under him, in fact, and I was watching him and I happened to look around to see how the other fellows were doing, and before I knew it I heard a flash and he walked into the energized area. All he had to do was go to his right instead of to his left and he would have been cleared." Morakis estimated that Lexie was more than ten feet inside the energized area at the time of the accident. He also testified that Lexie had "walked right into the main bus." When asked how he knew that Lexie had walked into the energized area, Morakis responded, "[b]ecause we saw the burn from his glove, evidently, on the main bus there." Morakis testified further that Lexie was working in a safe (de-energized) area prior to the accident, and that Lexie was under his direct supervision and control the entire time:

"Q. Wherever [Lexie] was working, he was working in an area that you had instructed him to work?

"A. Yes.

"Q. Is that correct?

"A. Yes, right, and he was just finishing up that particular area I sent him to and all he had to do was go to his right and come down the de-energized area, which would have been no problem.

"Q. All right. My question to you here is is it possible you had instructed [Lexie] to work in an energized area?

"A. No.

"Q. That's not possible?

"A. No.

"Q. Could it have been a mistake on yours [*sic*, your] or [Campbell's] part and you put him in an area that was energized by mistake?

"A. No, because I double check. If I'm in doubt I ask the [Ohio Edison] inspector.

4

"Q. Did you ask the inspector on the job in this case?

"A. Not that I recall.

"Q. Is it possible that you did and you had him in the wrong spot, in the wrong area?

"A. No, I didn't have him in the wrong spot. I knew exactly where I was putting him."

{¶ 8} Campbell was deposed in May 1991. Campbell could not recall whether he had personally performed the switching procedures to de-energize sections of the "69 KV bay" where Lexie was painting on the day of the accident. However, there is apparently no dispute that an area or section of the bay had in fact been de-energized by Ohio Edison. Campbell was outside the bay when the accident occurred. However, he arrived at the scene moments later and observed Lexie lying on the ground "a little bit more towards underneath the energized [area] than the de-energized [area]."

{¶ 9} Lexie suffered severe injuries as a result of the accident. On July 14, 1989, he filed a complaint in the Court of Common Pleas of Trumbull County against Ohio Edison. In the complaint, Lexie alleged, among other things, that Ohio Edison had acted negligently in failing to (1) provide a safe place of employment, (2) eliminate known hazards, (3) "adequately supervise the work activities," (4) install proper safety devices, and (5) de-energize the electrical lines involved in the accident. On August 4, 1989, Ohio Edison filed its answer to the complaint.

{¶ 10} In February 1991, Ohio Edison moved for summary judgment. Relying primarily on the case of *Wellman v. E. Ohio Gas Co.* (1953), 160 Ohio St. 103, 51 O.O. 27, 113 N.E.2d 629, Ohio Edison argued that it had owed no duty to Lexie because he had been working for an independent contractor when the accident occurred, and because the job of painting electric substations is an inherently dangerous activity. Additionally, Ohio Edison argued that it had not

actively participated in the painting work, since Morakis Sons had directed and controlled the activities of the painting crew. In support of its motion, Ohio Edison relied on, among other things, Lexie's deposition testimony, the March 1987 contract between Morakis Sons and Ohio Edison, and an affidavit signed by Morakis. Morakis's affidavit includes the following averments:

"4. Prior to painting such substation, I informed Michael Lexie as well as other employees working on this job of the presence and location of the live conductors in the Ohio Edison Masury substation.

"5. An Ohio Edison employee advised me of the location of the live electrical conductors before we began to paint. I passed this information on to my crew. I personally assigned the work tasks to each of the employees and informed them of the presence of hazards associated with this job on July 15, 1987.

"6. In addition to being informed of the presence of live conductors at this substation on July 15, 1987, Michael Lexie, at the time of his initial employment with Morakis Sons, was made aware that he would be painting high towers and substations, all of which could contain live electric conductors. Said Michael Lexie acknowledged his awareness of these conditions by signing a preemployment form containing such a warning."

{¶ 11} On June 26, 1991, Lexie filed a memorandum in response to the motion for summary judgment. Lexie essentially argued that Ohio Edison's control over the activation and de-activation of the electrical conductors had amounted to "active participation" by Ohio Edison in the painting of the Masury substation. Therefore, Lexie argued that *Hirschbach v. Cincinnati Gas & Elec. Co.* (1983), 6 Ohio St.3d 206, 6 OBR 259, 452 N.E.2d 326, controlled, and that *Hirschbach* supported a finding that Ohio Edison had owed a duty of care to Lexie to eliminate hazards which Ohio Edison, in the exercise of ordinary care, could have eliminated.

{¶ 12} In September 1991, the trial court denied Ohio Edison's motion for summary judgment. The case was then set for trial. However, trial was continued

on a number of occasions over a period of approximately four years. Lexie died during the period of delay,[1] and appellee Carol A. Sopkovich, the administrator of Lexie's estate,[2] was substituted as the plaintiff in the action.

{¶ 13} In August 1995, Ohio Edison filed a "Motion for Reconsideration" of the trial court's denial of the motion for summary judgment. In support of the motion for reconsideration, Ohio Edison argued, among other things, that two cases decided by this court in June and July 1995 (*i.e.*, *Bond v. Howard Corp.* [1995], 72 Ohio St.3d 332, 650 N.E.2d 416, and *Michaels v. Ford Motor Co.* [1995], 72 Ohio St.3d 475, 650 N.E.2d 1352), supported a determination that Ohio Edison was entitled to summary judgment for the reasons that had been set forth in Ohio Edison's original motion. After appellee failed to respond to the motion to reconsider, the trial court, in December 1995, granted summary judgment in favor of Ohio Edison.

{¶ 14} On appeal, the court of appeals determined that "there are clearly two separate sets of facts which can create a 'duty of care' under an 'active participation' analysis." The two aspects or prongs of the active-participation analysis identified by the court of appeals were (1) active participation through the direction or control of the performance of the work activities, and (2) active participation through the exertion or retention of control over "a critical variable in the working environment." The court of appeals held that Ohio Edison was entitled

---

1. The record before us contains no indication as to the cause of Lexie's death. However, appellee states in her brief that "[o]n May 24, 1993, Michael J. Lexie died for reasons unrelated to his injuries * * *." In a motion filed with the court of appeals, Ohio Edison asserted that "while [this fact is] not in the record, Mr. Lexie was arrested for drunk driving, jailed, and while in jail committed suicide." Thus, it is undisputed that the cause of Lexie's death was unrelated to the injuries he suffered in the July 1987 accident.

2. We are cognizant of the fact that the historical and common designation of a female administrator of a decedent's estate has been "administratrix." However, in our continuing efforts to make our language gender neutral, we now use the term "administrator" regardless of the gender of the fiduciary.

to summary judgment on the question of whether Ohio Edison had directed or controlled the performance of Lexie's job activities, stating:

"These [evidentiary] materials established that Campbell, [Ohio Edison's] representative at the substation, did not try to direct the work activities of Lexie or any of the other painters. Instead, the materials established that Campbell's limited contact with the painters was for the purpose of informing them which of the lines had been de-activated. To this limited extent, the trial court correctly granted summary judgment finding that [Ohio Edison] had not directed or controlled the work activities of the paint crew."

{¶ 15} However, the court of appeals concluded that the question of controlling the work activities of the paint crew was "not dispositive of the 'active participation' argument, as it does not totally answer the ultimate question of whether [Ohio Edison] owed a duty of care to Lexie." In this regard, the court of appeals stated:

"[A] property owner can also 'actively participate' in the performance of the work by exerting control over the employee's environment, *i.e.*, the place of employment. By retaining sole control over a critical variable in the working environment, a property owner can have as much influence over an employee's safety as when the property owner directly controls the activities of the employee. Thus, it follows that the property owner owes a duty of care to an employee of the independent contractor when the owner exerts or retains such control.

"In the instant case, the evidentiary materials of both parties [i]ndisputably showed that [Ohio Edison] did exert control over one vital aspect of Lexie's working environment: the de-activation of specific electrical lines in the work area. Under these facts, Lexie's safety would have been dependent upon [Ohio Edison's] proper de-activation of the lines at the proper moment. In addition, Lexie's safety would have been dependent upon the dissemination of correct information by Campbell as to which lines had been de-activated at any given time."

**{¶ 16}** Accordingly, the court of appeals held that Ohio Edison was not entitled to summary judgment "as to the total 'duty of care' issue" because a question remained whether Ohio Edison, through Campbell, "had created a duty of care by retaining and exerting control over a critical aspect of Lexie's working environment." Therefore, the court of appeals reversed the judgment of the trial court and remanded the cause to that court for further proceedings. In so holding, the court of appeals noted that, among other things, the evidence on summary judgment had shown that Ohio Edison had assumed a specific duty relating only to the de-activation of electrical lines and communication of the correct information to Morakis. Thus, the court of appeals instructed the trial court that, on remand, "any liability on the part of [Ohio Edison] can only be predicated upon its actions in undertaking a specific duty." Thereafter, the court of appeals, finding its judgment on the issue of active participation to be in conflict with the decision of the Court of Appeals for the Ninth Appellate District in *DeHass v. Ohio Edison Co.* (Sept. 15, 1993), Summit App. No. 15970, unreported, 1993 WL 347059, entered an order certifying a conflict. The cause is now before this court upon our determination that a conflict exists. *Lexie v. Ohio Edison Co.* (1997), 78 Ohio St.3d 1454, 677 N.E.2d 815.

------------------

*Martin F. White Co., L.P.A.*, *Martin F. White* and *James J. Crisan*, for appellee.

*Hoppe, Frey, Hewitt & Milligan*, *William R. Hewitt* and *Kevin P. Murphy*, for appellant.

*Sally L. Geib*, urging reversal for *amicus curiae*, Cleveland Electric Illuminating Company.

*Denise M. Hasbrook*, urging reversal for *amicus curiae*, Toledo Edison Company.

------------------

**DOUGLAS, J.**

{¶ 17} The question that has been certified for our consideration is: "For purposes of determining when a property owner owes a duty of care to an employee of an independent contractor, does the property owner 'actively participate' in the performance of the employee's work by exercising exclusive control over an aspect of the employee's working environment?" For the reasons that follow, we answer the certified question with a qualified "yes."

{¶ 18} The court of appeals held that for purposes of determining whether a property owner owes a duty of care to the employees of an independent contractor, "active participation" includes situations in which a property owner exercises control over the work activities of the independent contractor, and also includes situations in which a property owner exercises control over a critical aspect of the employee's place of employment or "working environment." We agree with the court of appeals' conclusion in this regard. Applying the standards of summary judgment, the court of appeals held, and we agree, that Ohio Edison had no duty of care relating to its alleged control over Lexie's *work activities* as a painter, since those activities were directed exclusively by Morakis Sons. Thus, summary judgment was appropriate in that limited respect. However, the court of appeals also held, and we agree, that Ohio Edison was not entitled to summary judgment on the entire "duty of care issue" because a duty could have arisen from Ohio Edison's retention and exertion of control over a critical variable in the working environment, *i.e.*, the de-electrification of specific electrical conductors in the work area.

I

The Conflict

{¶ 19} *DeHass* involved a situation where DeHass, an employee of Morakis Sons, was injured by high voltage electricity while painting an electric substation owned and operated by Ohio Edison. On facts that are strikingly similar to the facts

in the case at bar, the court of appeals in *DeHass* upheld a grant of summary judgment in favor of Ohio Edison on the question of active participation, stating:

"DeHass contends that Ohio Edison contracted with Morakis Sons as an independent contractor, but then actively participated in the job operation. Had Ohio Edison directly participated in the painting operations of Morakis Sons, Ohio Edison could have been held responsible for DeHass' injury, if it could have eliminated the hazard which caused the injury. * * *

"Review of the record indicates that the Ohio Edison substation electrician switched the electrical load at the substation and informed Jim Morakis and his crew which equipment was energized and which was de-energized. He performed no other functions at the substation while employees of Morakis Sons painted the substation. Jim Morakis confirmed that the electrician was not supervising the Morakis Sons' employees nor *participating in the painting work*. * * * DeHass introduced no evidence of any *participatory conduct*. Testimony indicated that Ohio Edison had sole control over the de-energization of equipment at the substation; Morakis Sons controlled all aspects of the *painting work*." (Emphasis added.) *DeHass*, Summit App. No. 15970, unreported, at 6-7.

{¶ 20} We have previously entered a finding pursuant to S.Ct.Prac.R. IV(2)(C) that *DeHass* is in conflict with the decision of the court of appeals in this case on the question that has been certified for our consideration. 78 Ohio St.3d 1454, 677 N.E.2d 815. However, upon closer examination, we now find that the decision of the court of appeals in the case at bar and the decision in *DeHass* are not in conflict. Specifically, the *DeHass* court apparently limited its active-participation analysis to the question of whether Ohio Edison had participated in the actual work activities of the independent contractor's employees. Conversely, the court of appeals in the case before us went one step further by exploring the possibility that a duty was created by Ohio Edison's retention and exercise of control over one critical aspect of the working environment—the de-activation of

certain electrical lines in the work area. The court in *DeHass* apparently never explored that particular issue. Thus, it appears that *DeHass* does not directly conflict with the judgment of the court of appeals in this case. Nevertheless, since the certified question raises an important issue that has been fully briefed and argued before this court, we now move to address the question as if there were a conflict between the two appellate districts.

II

The Merits

**{¶ 21}** We begin our analysis with a review of our prior decisions involving the duties and responsibilities owed by one who engages the services of an independent contractor to perform an inherently dangerous task.

**{¶ 22}** In *Wellman*, 160 Ohio St. 103, 51 O.O. 27, 113 N.E.2d 629, paragraphs one and two of the syllabus, this court set forth the following general rule pertaining to the duty owed by one who engages an independent contractor to perform inherently dangerous work:

"1. Where an independent contractor undertakes to do work for another *in the very doing of which there are elements of real or potential danger* and one of such contractor's employees is injured as an incident to the performance of the work, no liability for such injury *ordinarily* attaches to the one who engaged the services of the independent contractor.

"2. One who engages an independent contractor to do work for him *ordinarily* owes no duty of protection to the employees of such contractor, in connection with the execution of the work, who proceeds therewith knowing and appreciating that there is a condition of danger surrounding its performance." (Emphasis added.)

**{¶ 23}** The plaintiff in *Wellman* had been employed as a welder's helper by an independent contractor. The independent contractor had been hired by the defendant gas company to lay a gas line. The gas company had inspectors at the

job site to ensure that the work was completed according to specifications. An employee of the independent contractor improperly removed a cap from the gas pipe. As a result, the cap struck plaintiff, fracturing one of his legs. In assessing whether the defendant owed a duty to the plaintiff, this court emphasized that the independent contractor was aware of the danger involved and, therefore, "it was [the independent contractor's] duty to warn and protect the plaintiff, and no such duty devolved on defendant." *Id*. at 107, 51 O.O. at 29, 113 N.E.2d at 632.

{¶ 24} Less than two years after the *Wellman* decision, this court held, in *Schwarz v. Gen. Elec. Realty Corp*. (1955), 163 Ohio St. 354, 56 O.O. 319, 126 N.E.2d 906, paragraphs one and three of the syllabus:

"1. Where an owner of premises engages an independent contractor to do work thereon, an employee of the contractor while performing the work is on the premises impliedly as an invitee of the owner, and the owner owes the employee the duty of exercising ordinary care to maintain the premises in a reasonably safe condition for use, this duty not extending, however, to any *inherent hazards* necessarily present because of the character of the work to be done." (Emphasis added.)

"3. Where the owner of premises employs an independent contractor to do work thereon, *is not in control of the work area*, *does not participate in the work, and gives notice to the contractor or to those in charge of the work of the potential danger of contact with a high-tension electric line maintained on the premises*, such owner is not legally obligated to give notice of such danger to the individual employees of such independent contractor who may be assigned by such contractor to unload steel beams at a site underneath such high-tension line." (Emphasis added.)

{¶ 25} In *Schwarz*, the General Electric Company ("GE") hired an independent contractor, Duffy Construction Corporation ("Duffy"), to perform structural work at GE's plant in Lockland, Ohio. As an incidental part of the work,

Duffy was required to unload steel beams using a crane with steel cables attached. The beams were to be unloaded and swung for placement directly underneath a high-voltage electric power line. GE designated the site for the unloading of the beams, but the job operation was entirely under the control of Duffy. The plaintiff, an iron worker employed by Duffy, was injured when the steel cables of the crane swung too close to the power line. The accident was caused by the negligence of the crane operator, who was also employed by Duffy. Prior to the job operation, GE had warned Duffy of the dangers associated with the power line. The job operation was recognized as a dangerous one by everyone involved in the operation except the plaintiff, who claimed that he had not seen the power line or been advised of its existence.

{¶ 26} In *Schwarz*, we applied the rule of *Wellman* to uphold the trial court's decision granting a directed verdict in favor of GE. We rejected a claim of liability predicated on GE's alleged failure to notify the plaintiff and to protect him from dangers, finding that GE had not "actually participated" in the job operation, was not in control of the work area, had notified Duffy of the dangers, and that the job operation had been entirely under the supervision and control of the independent contractor. *Id*. at 359-361, 56 O.O. at 321-322, 126 N.E.2d at 910. Under those circumstances, we found that the general rule of nonliability set forth in *Wellman* applied to the facts of the case. Thus, GE owed no duty to protect the plaintiff from danger or to directly warn him of the inherent risks associated with the job operation.

{¶ 27} In *Hirschbach*, 6 Ohio St.3d 206, 6 OBR 259, 452 N.E.2d 326, syllabus, we carved out an exception to the general rule set forth in *Wellman* and held that "[o]ne who engages the services of an independent contractor, *and who actually participates in the job operation performed by such contractor* and thereby fails to eliminate a hazard which he, in the exercise of ordinary care, could have

eliminated, can be held responsible for the injury or death of an employee of the independent contractor." (Emphasis added.)

{¶ 28} In *Hirschbach*, Cincinnati Gas & Electric Company ("CG & E") hired an independent contractor to replace electrical wire conductors. Hirschbach, an employee of the independent contractor, was killed when the tower arm collapsed. The collapse was caused by the tractor winch, which was positioned too close to the tower. Prior to the accident, Hirschbach and several fellow employees had sought permission from CG & E's inspector to position the winch tractor at a safe distance from the base of the tower. The inspector denied their request. Based on these facts, we reversed a summary judgment entered in favor of CG & E and concluded:

"[A] jury could reasonably conclude that CG & E had sole control over the safety features necessary to eliminate the hazard. *By denying the [independent contractor's] crew its request to reposition the winch tractor*: (1) CG & E refused to eliminate the hazard, (2) CG & E interfered with the mode of the job operation, and (3) *CG & E actually participated in the job operation by dictating the manner and mode in which the winching phase of the job was to be performed*." (Emphasis added and footnote omitted.) *Id*. at 208, 6 OBR at 261, 452 N.E.2d at 329.

{¶ 29} The factor distinguishing *Wellman* from *Hirschbach* is that in *Hirschbach*, the landowner who had engaged the independent contractor had *actually participated* in the specific job operation by retaining and exercising control over the work area and, thus, the manner in which the work was performed. Specifically, CG & E, as the property owner, would not permit the equipment to be moved, although moving the equipment was necessary for the job to be safely conducted. In comparison, the party who hired the independent contractor in *Wellman* had inspectors at the job site to ensure that the job was completed according to specifications, but the inspectors did not engage in any conduct that could constitute actual participation in the performance of the job operation.

**{¶ 30}** In cases decided after the *Hirschbach* decision, we were called upon to address the question whether a general contractor, simply by virtue of its general supervisory capacity over a construction site, owes a duty of care to the employees of an independent subcontractor engaged in inherently dangerous work. Such was the nature of the inquiry in both *Cafferkey v. Turner Constr. Co.* (1986), 21 Ohio St.3d 110, 21 OBR 416, 488 N.E.2d 189, and *Bond*, 72 Ohio St.3d 332, 650 N.E.2d 416. However, whereas the analysis in *Hirschbach* had turned on the question of the property owner's control over the *work area* of an independent contractor's employees, the active-participation analysis in *Cafferkey* and *Bond* focused on the question of a general contractor's control over the *work activities* of an independent subcontractor's employees.

**{¶ 31}** In *Cafferkey*, syllabus, we held that "[a] general contractor *who has not actively participated in the subcontractor's work, does not, merely by virtue of its supervisory capacity*, owe a duty of care to employees of the subcontractor who are injured while engaged in inherently dangerous work." (Emphasis added.)

**{¶ 32}** In *Cafferkey*, the general contractor contracted with an independent subcontractor to drill and install caisson foundations. In one of the caisson holes, the subcontractor detected methane gas and made certain efforts to dispel the gas. Nevertheless, the subcontractor allowed two of its employees to enter the hole to burn off, with a cutting torch, a portion of a metal casing. While in the hole, one of the employees struck his flint to light a torch. Consequently, an explosion occurred, and both employees were severely injured and later died. By contract, and by virtue of certain portions of the general contractor's safety manual, the general contractor had retained control over safety procedures at the project. The general contractor, however, was not informed of the subcontractor's decision to allow its employees to go into the hole.

**{¶ 33}** In *Cafferkey*, we compared the factual situation at issue in that case with the factual setting of *Hirschbach* and concluded that, as a matter of law, the

general contractor in *Cafferkey* owed no duty of care to the decedents. We explained that the general contractor in *Cafferkey* "did not actively participate in any action or decision that led to the fatal injuries. [The general contractor] may have known about some of [the subcontractor's] *activities*, but that knowledge does not constitute 'actual participation' *in those activities* within the *Hirschbach* rule. Unlike the landowner in *Hirschbach*, [the general contractor] neither gave nor denied permission for the critical acts that led to the decedent's injuries." (Emphasis added.) *Id*. at 112, 21 OBR at 418, 488 N.E.2d at 192. We also addressed the issue of the general contractor's retention of control over safety procedures at the job site, but noted that "Turner [the general contractor] had an obvious interest in safety and it insisted that its own employees as well as the employees of subcontractors carry on their work activities in as safe a manner as possible. Nevertheless, this concern for safety, which was evidenced in a variety of ways, does not constitute the kind of active participation *in Millgard's* [the independent subcontractor's] *work* that is legally required to create a duty of care extending from Turner to Millgard's employees." (Emphasis added.) *Id*. at 113, 21 OBR at 418, 488 N.E.2d at 192. It is clear from a reading of *Cafferkey* that the focus of the analysis in that case revolved around the concept of active participation in the *work activities* of the independent subcontractor's employees.

{¶ 34} In *Bond*, 72 Ohio St.3d 332, 650 N.E.2d 416, syllabus, we applied the *Cafferkey* analysis and defined "active participation" in the following terms:

"For purposes of establishing liability to the injured employee of an independent subcontractor, 'actively participated' means that the general contractor *directed the activity* which resulted in the injury and/or gave or denied permission for the critical acts that led to the employee's injury, rather than merely exercising a general supervisory role over the project. (*Cafferkey v. Turner Constr. Co*. [1986], 21 Ohio St.3d 110, 21 OBR 416, 488 N.E.2d 189, construed and applied.)" (Emphasis added.)

**{¶ 35}** As was the case in *Cafferkey*, the analysis in *Bond* focused almost entirely on the concept of active participation in the *work activities* of the independent subcontractor. However, the entire point of the *Bond* decision was to refine our holding in *Cafferkey* and to cut a definitive line between those situations in which a general contractor can be said to have "actively participated" in the work of an independent subcontractor, and those situations in which a general contractor merely exercises a general supervisory role over the construction project.

**{¶ 36}** In *Bond*, Howard Construction Company ("Howard") was a general contractor hired by General Cinema Corporation to construct a theater complex. Howard contracted with Valentine Construction, Inc. ("Valentine"), an independent subcontractor, to complete the masonry work for the construction project. Bond, a Valentine employee, was constructing a wall at the site using materials that had been placed near an unguarded opening on the second floor of the project. The materials had been placed in that location by a fellow employee. When Bond went to the area to retrieve materials to build the wall, he fell through the unguarded opening and was severely injured. On the basis of these facts, we upheld a grant of summary judgment in favor of Howard, stating:

"We believe, under the circumstances of this case, the trial court and court of appeals properly held that Howard was entitled to summary judgment. In this case, Howard did not actively participate *in the work performed by Valentine* because it neither gave nor denied permission for the critical acts that led to Bond's injuries—the placing of the materials used by Bond in constructing the wall. In fact, the materials were placed near the unguarded opening by another Valentine employee.

"A construction site is inherently a dangerous setting. * * * Bond was aware that the materials for the construction of the wall had been placed near the opening by a Valentine employee and that a railing had not been placed in front of the opening.

"Furthermore, we reject appellants' assertions that various contractual provisions involving Howard created a duty of care extending from Howard to employees of Valentine. The contractual provisions relied upon by appellants simply demonstrate that Howard retained general supervisory capacity over the construction project and, in particular, that it retained control over safety policies and procedures at the site. The general contractor's retention of the authority to monitor and coordinate activities of subcontractors and the retention of control over safety policies and procedures do not rise to the level of active participation, thereby extending a duty of care from a general contractor to a subcontractor's employees. *Cafferkey*, *supra*, at 113, 21 OBR at 418, 488 N.E.2d at 192.

"* * *

"At the oral argument of this case, appellants contended that the reason so many cases like this are coming before the various courts of this state is because there is no specific definition of the term 'actively participated.' Accordingly, we hold that for purposes of establishing liability to the injured employee of an independent subcontractor, 'actively participated' means that the general contractor *directed the activity* which resulted in the injury and/or gave or denied permission for the critical acts that led to the employee's injury, rather than merely exercising a general supervisory role over the project." (Emphasis added.) *Bond*, 72 Ohio St.3d at 336-337, 650 N.E.2d at 420-421.

{¶ 37} *Michaels*, 72 Ohio St.3d 475, 650 N.E.2d 1352, was decided shortly after our decision in *Bond*. However, *Michaels*, unlike *Cafferkey* and *Bond*, involved issues concerning the duty of care owed by a *landowner* to the employees of an independent contractor.

{¶ 38} In *Michaels*, Ford Motor Company hired Lathrop Contracting as a general contractor to construct a paint building at Ford's plant in Avon, Ohio. Doane Electric was a subcontractor on the construction site. Michaels was an employee of Doane Electric. While Michaels was clearing an area on the second

floor of the construction site, he fell through an unguarded hole in the floor that had been cut by Lathrop employees and that had been covered by a loose piece of plywood. Prior to the accident, an employee of Ford had instructed Lathrop's assistant superintendent to cut holes in the floor pursuant to specifications in the construction contract between Lathrop and Ford. Lathrop's assistant superintendent had objected to cutting the holes because of safety concerns, but Ford had insisted that the holes be cut and then covered. Pursuant to its contract with Ford, Lathrop was responsible for maintaining barricades and guard rails around the floor openings.

{¶ 39} In *Michaels*, a plurality of this court analyzed our cases from *Wellman* through *Bond* and found that Ford, the owner of the construction site, owed no duty of care to Michaels because (1) Ford had not "actively participated" under the definition of "active participation" set forth in *Bond*, and (2) Ford had retained no custody or control over the work area where the injury occurred. Specifically, in *Michaels*, the plurality stated:

"In the case before us, Ford exercised its proper supervisory role by monitoring work progress at the construction site, interpreting plans and specifications, and ensuring that construction was completed according to required specifications. As part of its supervision, Ford directed Lathrop, the general contractor, to cut floor openings as required by contract specifications. Applying the *Bond* definition of 'actively participated,' the 'activity which resulted in the injury' to Michaels and the 'critical act' that led to Michaels' injury was the failure to adequately safeguard the hole through which Michaels fell. Ford neither directed Lathrop as to the manner in which the latter should safeguard the floor opening nor gave or denied permission with regard to the way in which the hole was covered. *Much to the contrary, Ford retained no custody or control over the area where Lathrop cut the hole through which Michaels subsequently fell.* Nor did Ford retain control over the means or manner of Lathrop's or Doane Electric's performance of

any of their duties at the construction site.  Cf. *Hirschbach*, *supra* (where the owner directed the manner in which an independent contractor performed an inherently dangerous job)." *Michaels* at 479, 650 N.E.2d at 1355-1356.

{¶ 40} As is clear from *Hirschbach,* and from cases preceding and postdating *Hirschbach* (see, *e.g*., *Schwarz* and *Michaels*), a property owner's retention of possession and control over the work area of an independent contractor's employees has always been an integral part of the active-participation analysis, where, as here, the owner's liability is at issue.  Moreover, as is evident from a careful review of the foregoing authorities, active participation giving rise to a duty of care may be found to exist where a property owner either directs or exercises control over the work activities of the independent contractor's employees, or where the owner retains or exercises control over a critical variable in the workplace.

{¶ 41} There is no question that painting a partially de-energized substation is inherently dangerous and, in this case, Morakis and Lexie were aware of the dangers associated with that work.  Additionally, the evidentiary materials clearly demonstrate that Ohio Edison did not participate in the actual work activities of the independent contractor.  Ohio Edison did not direct or control any of the work activities of Morakis Sons or the job activities of the individual painters.  At most, Ohio Edison's representative at the site exercised a general supervisory role over the painting project to ensure that the painting work was properly completed.  Edison's employee had virtually no contact with the painting crew except to inform them of the location of the activated and de-activated lines.  Moreover, Ohio Edison neither granted nor denied permission with respect to any aspect of the job activities of the independent contractor.  Ohio Edison did, however, retain and exercise exclusive control over a critical variable in the working environment, *i.e*., the de-activation of specific electrical conductors in the work area.  In this regard, the court of appeals concluded that a question remained as to whether Ohio Edison owed a

duty of care to Lexie stemming from Ohio Edison's retention and exercise of such control. We agree with the court of appeals' analysis of the issue. Specifically, we believe that the evidence in this case supports a finding of active participation and, thus, a duty extending from Ohio Edison to Lexie based upon Ohio Edison's retention and exercise of control over a critical aspect of Lexie's working environment. This is so regardless of the fact that Ohio Edison did not actively participate in the specific job activities of the independent contractor's employees.

{¶ 42} We emphasize, however, that any duty Ohio Edison may have owed to Lexie is not absolute. The reason, of course, is that Ohio Edison's participation in this case was clearly limited to the tasks of de-electrification of certain conductors in the work area and the dissemination of correct information concerning which conductors were energized and which had been de-activated. Therefore, as the court of appeals correctly recognized, Ohio Edison's liability (if any) may only be predicated on a breach of a specific duty that Ohio Edison undertook to perform, *i.e.*, the tasks of de-electrification and communication. Accordingly, if Ohio Edison properly de-activated the conductors it had promised to de-activate, and accurately communicated with Morakis and the painters as to which conductors were activated and which were not, Ohio Edison would have discharged any duty of care owed to Lexie. Conversely, if Ohio Edison failed to de-activate the conductors it had promised to de-activate, or misinformed Morakis or Lexie as to which conductors were de-activated, liability could attach for Ohio Edison's failure to properly discharge a specific duty it had undertaken to perform, assuming that such failure was the proximate cause of Lexie's injuries.[3]

---

3. We note, in passing, that the evidentiary materials strongly suggest that Ohio Edison did de-activate specific conductors in the work area and that it disseminated correct information to Morakis and to the painters concerning which conductors were energized and which had been de-activated. Further, the evidence strongly indicates that the cause of Lexie's injuries was that Lexie mistakenly entered into an area that was known to be an energized area. However, the sole issue in this appeal is whether the evidence was sufficient to survive summary judgment on the question of duty of care. The question whether Ohio Edison breached a duty of care, and the question whether such a breach

**{¶ 43}** For the foregoing reasons, we affirm the judgment of the court of appeals.

*Judgment affirmed.*

RESNICK, F.E. SWEENEY, PFEIFER and WOLFF, JJ., concur.

MOYER, C.J., and LUNDBERG STRATTON, J., concur in part and dissent in part.

WILLIAM H. WOLFF, JR., J., of the Second Appellate District, sitting for COOK, J.

_____

**LUNDBERG STRATTON, J., concurring in part and dissenting in part.**

**{¶ 44}** I agree with the excellent analysis of the law as laid out in the majority's opinion.  However, I do not agree with the majority's decision to affirm the judgment and remand this cause to the trial court, as I believe that reasonable minds cannot differ that Ohio Edison should be granted summary judgment.

**{¶ 45}** Ohio Edison sought summary judgment for the entire case.  The issue of whether it gave or denied permission for any critical act that led to Michael Lexie's injury and whether that information was communicated to James Morakis *was* before the court.  Ohio Edison specifically relied on *Bond v. Howard Corp.* (1995), 72 Ohio St.3d 332, 650 N.E.2d 416, in its motion to reconsider the denial of the motion for summary judgment.  The pleadings, depositions, and affidavits before the trial court contained sufficient undisputed evidence from which the court could conclude that there was no genuine issue whether Ohio Edison did properly de-energize the area where Lexie was working and did accurately communicate this information to Morakis and his painters.

**{¶ 46}** Pat Campbell testified that the area where Lexie was working had been de-energized. Morakis testified that Campbell told him which areas were

(if any) was the proximate cause of Lexie's injuries, are matters to be resolved at trial or pursuant to a proper motion for summary judgment on the issue of breach of duty and/or proximate causation.

energized and which areas were not. Morakis further testified that he passed this information on to his employees. In addition, Lexie testified in his deposition that Pat Campbell also informed him of the areas which were "hot" and those which were "cold." Appellee failed to submit any evidence in response to Ohio Edison's motion to reconsider that would create an issue of material fact.

{¶ 47} The "critical act" that led to Lexie's injury was his entering an energized area. Ohio Edison did not give him permission to enter that area. Nor did Morakis give him permission to enter that area. Morakis had already advised Lexie that that area was "hot." In fact, Morakis testified, as pointed out by the majority:

"A.    It was de-energized where he was working and he just finished up and I happened to be — I was right under him, in fact, and I was watching him and I happened to look around to see how the other fellows were doing, and before I knew it I heard a flash and he walked into the energized area. All he had to do was go to his right instead of to his left and he would have been cleared.

" * * *

"Q.    Wherever Michael was working, he was working in an area that you had instructed him to work?

"A.    Yes.

"Q.    Is that correct?

"A.    Yes, right, and he was just finishing up that particular area I sent him to and all he had to do was go to his right and come down the de-energized area, which would have been no problem.

"Q.    All right. My question to you here is is it possible you had instructed [Lexie] to work in an energized area?

"A.    No.

"Q.    That's not possible?

"A.    No.

"Q.     Could it have been a mistake on yours [*sic*, your] or [Campbell's] part and you put him in an area that was energized by mistake?

"A.     No, because I double check.  If I'm in doubt I ask the [Ohio Edison] inspector."

**{¶ 48}** Such testimony clearly established that Ohio Edison had communicated to Morakis which areas were energized and which were de-energized.  Morakis, in fact, had communicated this to Lexie.  Therefore, there is *no* dispute of fact over whether the lines were properly de-energized, nor over whether that information had been communicated to both Morakis and Lexie.

**{¶ 49}** In fact, Morakis continued in his testimony:

"Q.     Is it possible that you did and you had him in the wrong spot, in the wrong area?

"A.     No, I didn't have him in the wrong spot.  I knew exactly where I was putting him."

Lexie also testified that he knew that if a line was energized, he should not "even come close."

"Q.     When he [Morakis] said that certain lines were hot you knew that you shouldn't touch them or get close to them?

"A.     Yes."

**{¶ 50}** The simple, unfortunate and undisputed fact is that Lexie turned left instead of right, directly into an energized area.  There is no issue on which reasonable minds could differ, as no dispute exists on these points.  Footnote 3 of the majority's opinion concedes nearly as much.  The evidence does not just "strongly suggest" these conclusions — the evidence is undisputed.

**{¶ 51}** Because Ohio Edison properly moved for summary judgment on all issues, and the evidence is not in dispute, we should reverse the court of appeals and reinstate the trial court's grant of summary judgment.  Therefore, I respectfully dissent.

MOYER, C.J., concurs in the foregoing opinion.

_____