DECISION AND JUDGMENT ENTRY
{¶ 1} This appeal arises from a summary judgment granted by the Williams County Court of Common Pleas. Because we conclude that the trial court did not err in granting summary judgment, the judgment is affirmed.
 {¶ 2} Appellant, Sandra Tipton, as administratrix and individually, brought suit claiming negligence, wrongful death, and employer intentional tort, following the electrocution death of her husband, Curtis Tipton ("Tipton") on November 29, 1999, while he was working at the Weber Sand and Gravel, Inc. ("Weber") business site. Sandra sued appellee Weber; Bernie's Electric Sales Service, Inc. ("Bernie's"), the electrical contractor responsible for maintenance of Weber's electrical system; and Pahl's Ready Mix Concrete, Inc. ("Pahl's"), Tipton's employer and a company owned by Weber.
 {¶ 3} Weber and Pahl's filed a joint motion for summary judgment, asserting that appellant could not establish an employer intentional tort claim. Bernie's also moved for summary judgment, asserting that no admissible evidence was presented to establish that it or its employees negligently maintained Weber's electrical system or proximately caused Tipton's death. The trial court granted the defendants' motions. On appeal, this court upheld summary judgment for Pahl's, but reversed as to Weber and Bernie's. See Tipton v. Bernie's Electric Sales Services,Inc., 6th Dist. No. WM-02-009, 2003-Ohio-1629. Appellant, Sandra Tipton, has since settled with and dismissed her claim against Bernie's.
 {¶ 4} On remand, Weber renewed its motion for summary judgment. The trial court granted summary judgment in favor of Weber, stating that Weber owed no duty to Tipton under R.C. 4101.1, the frequenter statute.[1] The court found that the danger was "so obvious and apparent to [Tipton] that he may have been reasonably expected to have discovered it and protected himself against it."
 {¶ 5} Assignment of Error
 {¶ 6} Sandra Tipton now appeals, asserting a single assignment of error:
"Whether the trial court erred to the prejudice of Appellant by granting Appellee Weber Sand and Gravel, Inc.'s motion for summary judgment."
 {¶ 7} Standard of Review
 {¶ 8} The standard of review of a grant or denial of summary judgment is the same for both a trial court and an appellate court. Lorain Natl. Bank v. Saratoga Apts. (1989),61 Ohio App.3d 127, 129. Summary judgment will be granted if "the pleading, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of facts, if any, * * * show that there is no genuine issue as to any material fact" and, construing the evidence most strongly in favor of the non-moving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law." Civ.R. 56(C). An appellate court reviews summary judgments de novo and without deference to the trial court's determination. Brown v. SciotoCty. Bd. of Commrs. (1993), 87 Ohio App.3d 704; Coventry Twp.v. Ecker (1995), 101 Ohio App.3d 38.
 {¶ 9} Facts
 {¶ 10} The facts before the trial court came from the deposition testimony of Christopher Hentzell, a Weber employee; Scott Blue, Weber's mine site foreman; William Cheesbro, a Weber employee; Gary Rothwell and Gregory D. Plumly, mine safety inspectors from Ohio's Department of Natural Resources ("ODNR"); Thomas Weber, the gravel pit owner; Bernard Schliesser, owner of Bernie's Electric; Todd Feltz, a Bernie's employee; and James Ruggieri, an electrical engineer hired to provide expert analysis and opinions regarding Weber's electrical system and safety procedures.
 {¶ 11} Christopher Hentzell testified that on November 29, 1999, Tipton was attempting to repair a leak in a dredge machine located on Weber's business site. Hentzell said that his job included driving a truck, operating the dredge, and running a front-end loader. Hentzell said that although he never received "formal" training, Tipton taught him how to operate the dredger and Scott Blue had trained him in electrical safety procedures, including "lock-out" and "tag-out" of electrical equipment.
 {¶ 12} On the day of the incident, Hentzell was called out to help Tipton fix a leak in the dredge pipe which had separated. He and Tipton used a small metal boat to go out to the float attached to the dredger. When the men began to use a "come along" to pull the pipe sections together, Tipton told Hentzell to "be careful because the power was on." Hentzell noted that the power could be shut off inside the dredger itself or at the power box on shore, but that Tipton never said anything about shutting it off. Normally, the pipe was above water and power lines ran above the pipeline, suspended on a framework called a gantry. Hentzell noted, however, that in trying to pull the rubber sleeve onto the pipe, Tipton bent the gantry which then caused the wires to sag below the pipeline.
 {¶ 13} After finally pulling the sections together into the rubber sleeve, Tipton put a chain clamp around the pipe and the men began to tighten the clamp. Unknown to either man, Tipton had inadvertently put the chain around the power line that sagged into the water on the opposite side of the pipe. When the chain tightened, it bit into the power line, sending current through Tipton, grounding into the boat or water. Hentzell turned as he heard Tipton making a grunting noise and tried to push Tipton away from the clamp as he was being electrocuted. Tipton fell to the boat floor and was not responsive. Hentzell was ultimately able to wave down help from an employee on shore who called 911. Tipton was treated by emergency crews but died as a result of the injuries from the electrocution.
 {¶ 14} Scott Blue, Weber's site manager, testified that he gave Tipton his daily work assignments. Tipton was in control of how he did his job in operating or repairing the dredge and whether to shut the power down. Other than changing blown fuses and splicing shorted out wires, any electrical work was done by licensed electricians. Blue agreed that in October 1997 Bernie's Electric had performed testing and repairs to the electrical system. Bernie's provided the annual testing report required by the Mine Safety and Health Administration ("MSHA"). After Bernie's found several areas of the plant which did not meet MSHA requirements, it was hired to perform necessary repairs, including bringing "the ground test continuity resistance testing" within required MSHA parameters. Blue stated that he had no knowledge that Bernie's had not adequately performed the work. He also noted that Weber did not have a specific company safety manual, but that safety procedures were covered by manuals issued by either the state of Ohio or federal safety agencies. Blue said that after any federal or state inspections, employees were informed of any specific safety issues.
 {¶ 15} Another Weber employee, William Cheesbro, testified that he had helped Tipton repair the pipeline in the past and Tipton had previously worked with chain clamps. Cheesbro acknowledged that he saw no need to shut down electricity if parts of the pipeline worked on were not near power lines. Once, during a pipe section repair, Tipton had told Cheesbro that the power was off. After the repair was complete, however, Cheesbro discovered that Tipton had never shut the power down. When Cheesbro expressed his concern, Tipton had laughed and told him that he worried too much. Cheesbro stated that after that instance, he always insisted that he see Tipton shut off the electric before doing any repairs on the dredge which would be close to power lines. Each time, Tipton's response was usually that Cheesbro worried too much.
 {¶ 16} Two mine safety inspectors from Ohio's Department of Natural Resources ("ODNR"), testified about the accident investigation conducted on December 2 and 7, 1999, and about the report issued. Gregory D. Plumly inspected certain conditions at the site and helped prepare the report. The electrical portion of the report was written by Gary Rothwell, an individual qualified in electrical inspection. Plumly verified, however, that an earlier report indicated that a routine safety inspection had been conducted by the ODNR on September 28, 1999 which revealed no electrical safety issues.
 {¶ 17} Gary Rothwell, an inspector with certification in mine electrical inspection, testified that ODNR inspectors use MSHA regulations and National Electric Code standards to determine violations in electrical conditions at a mine site. He verified that the Tipton investigation report showed that the breaker used in the electrical box going out to the dredge at the Weber site was not the proper size. Rothwell indicated that this could cause overheating and excessive tripping of the breaker. He also noted that the report stated the grounding circuit conductor was not the proper size wire and grounding conductors (wires) were not properly spliced. Rothwell stated that there were indications that arcing had occurred, causing heat damage to the wiring in some areas.
 {¶ 18} Thomas Weber, the owner of Weber Sand and Gravel, testified that the Weber company owns Pahl's, Tipton's employer. Weber leases the business property where the accident occurred from an individual third party, unrelated to and separate from either company. Weber stated that Tipton had taken over the dredge job when another employee left. Weber also acknowledged that although Tipton actually worked at the Weber site, Pahl's continued to issue his paycheck because of unchanged paperwork.
 {¶ 19} Weber related that MSHA representatives inspect the equipment at the plant, including the electrical systems, at least once per year to ensure that the plant meets MSHA standards. He said that the ODNR also inspects twice a year. Weber stated that at the time of the accident, he believed that the company had a safety manual which was supplied to employees. He understood that the manual consisted of state and federal regulations applicable to the mining business.
 {¶ 20} Weber testified that the electrical box which provided power to the dredge was changed in 1996, when brand new wiring was put in to upgrade the old system and address safety concerns. A Weber employee installed the new box and ran a new single rubber covered cable to the dredge, replacing the old four separate wires. A new "kickout" wire[2] was also installed and the "kick-out" button functioned correctly. He also said that there were circuit breakers on both the dredge and the shore electrical box.
 {¶ 21} Weber stated that both the state and federal agencies inspected and approved the new electrical system and the circuit breakers. He said that the company had been inspected "a minimum of three times a year by a minimum of six different people" and always met the required specifications. Weber recalled that, sometime before the accident, Bernie's had been called to check two minor problems on the dredge. When asked about the accident investigation report issued by the ODNR, Weber could not explain the deficiencies found in the grounding surge conductor and its connection to the power conductors, especially in light of the earlier agency inspections and approval. He also noted that there was a disagreement between MSHA size requirements on the circuit breaker and the manufacturer's recommendations.
 {¶ 22} Bernard Schliesser, the owner of Bernie's Electric testified that in October 1997, his company evaluated the grounding in the electrical power box to the dredge in response to inspections performed by inspectors from MSHA and ODNR. Finding that the grounding system was not up to code, his company corrected the problem by adding an additional ground. He also noted that the power cable suspended over the pipeline was within code requirements since it was in a normally non-accessible area.
 {¶ 23} Todd Feltz, a Bernie's employee, testified that he performed some of the replacement and repairs at the Weber site. Feltz recalled fixing an inadequate ground on the main pump motor on the dredger itself. He also was involved in replacing the electrical wires and box after Tipton's death. He said that he was surprised that the electrical box had a circuit breaker with incorrect amperage, since an inspector could have noticed it by merely looking in the box. Feltz said he never had reason to look in the electrical box and did not notice any other problems or violations at the site other than the ones reported.
 {¶ 24} The deposition of James Ruggieri, an expert in electrical distribution systems, was also presented. He testified to conducting a forensic analysis of the possible electrical conditions and causes leading to Tipton's death. He opined that the main cause of action against Bernie's was that they had failed to provide or certify that the grounding system was adequate at the Weber site. He also stated that, in his opinion, Tipton's death was caused by inadequate training, lack of appropriate protective equipment, and lack of adequate supervision.
 {¶ 25} Legal Arguments
 {¶ 26} Appellant raises three arguments in support of her assignment of error: 1) Weber breached its duty to provide a safe workplace under R.C. 4101.11; 2) the comparative negligence of Tipton and Weber is a jury question; and 3) primary assumption of the risk is inapplicable to Tipton's actions. Appellant[3]
first argues that the trial court erred in determining that Weber had no duty under R.C. 4101.11 which provides that:
 {¶ 27} "Every employer shall furnish employment which is safe for the employees engaged therein, shall furnish a place of employment which shall be safe for the employees therein and for frequenters thereof, shall furnish and use safety devices and safeguards, shall adopt and use methods and processes, follow and obey orders, and prescribe hours of labor reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees and frequenters."
 {¶ 28} Under R.C. 4101.11, the duty owed to frequenters, including employees of other companies, is merely a codification of the common-law duty owed by an owner or
 {¶ 29} occupier of premises to invitees, i.e., that the premises be kept in a reasonably safe condition, and that warning be given of dangers of which the property owner or occupier has knowledge. Eicher v. U.S. Steel Corp. (1987),32 Ohio St.3d 248, 249. If an employer owes a duty under the frequenter statute, an employer will be liable in negligence for injury to a frequenter where it failed to eliminate a hazard which it, in the exercise of ordinary care, could have eliminated. See Hirschbachv. Cincinnati Gas Elec. Co. (1983), 6 Ohio St.3d 206, 208. Accord Tackett v. Columbia Energy Group Serv. Corp. (Nov. 20 2001), 10th Dist. No. 01AP-89.
 {¶ 30} An independent contractor working on the premises is a business frequenter. Hunter v. State Dep't of Mental Retardation Developmental Disabilities (Feb. 15, 1996), Franklin App. No. 95API09-1184; Keffer v. Honda of America Mfg. Co. (Dec. 7, 1990), Union App. No. 14-89-28. The duty owed to frequenters, however, does not extend to protection against hazards which are inherently and necessarily present because of the nature of the work performed. Eicher, supra, at 249. The frequenter may recover when the injury results "by reason of the abnormally dangerous condition of the premises, only if the principal employer has, and the servant has not, actual or constructive notice of the existence of such condition." Id., citing Davis v.Charles Shutrump Sons Co. (1942), 140 Ohio St. 89, paragraph one of the syllabus.
 {¶ 31} Work is "inherently dangerous" when it "creates a peculiar risk of harm to others unless special precautions are taken." Pusey v. Bator, 94 Ohio St.3d 275, 279, 2002-Ohio-795. Comment c). To be inherently dangerous, it is not necessary that the work involve a high risk of harm, only that it involves an prior recognizable risk of physical harm to others which is inherent in the work itself. Pusey, supra, at 280, citing to Restatement of the Law 2d, Torts, (1965), Section 427; Bohme,Inc. v. Sprint International Communications Corp. (1996),115 Ohio App. 3d 723, 736 (inherently dangerous activity need not be extremely or even highly dangerous).
 {¶ 32} Nonetheless, for the "inherent danger" rule of non-liability to apply, the independent contractor must know or appreciate that a degree of danger "surrounds" the performance of the task for which he was hired. See Wellman v. East Ohio GasCo. (1953), 160 Ohio St. 103, at paragraph two of the syllabus. See, also, Sopkovich v. Ohio Edison Co. (1998),81 Ohio St.3d 628, 643, (plaintiff was aware that painting a partially de-energized substation is an inherently dangerous activity);Bond v. Howard Corp. (1995), 72 Ohio St.3d 332, 336 (plaintiff was aware of dangers lurking within construction site) Schwarzv. General Electric, 163 Ohio St. 354, 360, (inherent danger exception did not apply when "the independent contractor and his employees enter upon the premises of the contractor's employer as his invitees, unaware and uninformed of hidden dangers on the premises which had been created by the employer or of which he had full knowledge"); Frost v. Dayton Power Light Co. (2000),138 Ohio App.3d 182, 198.
 {¶ 33} Ohio courts have generally treated the issue of whether employment is inherently dangerous as a question of law to be determined by the court. See Sopkovich, supra; Frost,
supra; Best v. Energized Substation Serv., Inc. (1993),88 Ohio App.3d 109. Whether work is inherently dangerous is determined on the particular facts of each case. Where a worker is working around energized electric lines and appreciates the risk of electrocution, the task and situation has been considered to be inherently dangerous. See Sopkovich, supra, at 643 (painting a partially de-energized electrical station, because of the obvious risk of electrocution, is inherently dangerous work); Best,
supra, at 114 (working in electrical fields obviously involves dangers that are necessarily present); Truman v. Toledo Edison
(Dec. 31, 1987), 6th Dist. No. L-87-040 (common sense dictates that working around electricity is inherently dangerous).
 {¶ 34} This court has already determined that Tipton was engaged in a dangerous activity. He was working on repairing the pipeline while sitting in a metal boat on water near electrical lines. See Tipton v. Bernie's Elect. Sales Servs., 6th Dist. No.WM-02-009, 2003-Ohio-1629 at ¶ 17. The record confirms that Tipton was engaged in inherently dangerous work. It shows that Tipton realized that the electric power was on and appreciated the immediate danger, to the extent of warning Hentzell to "be careful." In addition, Tipton had worked on the site and made similar repairs for more than two years previously. Through the testimony of his co-workers, the evidence shows that Tipton knew the policy of cutting the power before undertaking such work; yet, he disregarded it. In doing so, he ignored a known danger of his work environment.
 {¶ 35} After the accident, the investigation revealed an additional hazard that Tipton apparently did not know of or appreciate. That is, the electrical system was allegedly not properly grounded, meaning the breaker was prevented from shutting down the power as it should have. Since the inherently dangerous exception to the frequenter statute applies only if the business occupier has no actual or constructive notice of the existence of a hidden hazard, we must now determine whether any evidence was presented which demonstrated that Weber or its employees knew, or should have known, of this hazard.
 {¶ 36} After reviewing information obtained as a result of the post-accident investigation and discovery depositions, the expert witness testimony opined that there were various
 {¶ 37} alleged hazards or violations in the electrical system. The record shows, however, that parties other than Weber were ultimately responsible for the detection of these violations. Weber had complied with the required regular inspections by both federal and state agencies, promptly correcting any discovered violations. In February 1999 and again in September 1999, approximately two months before the accident, the ODNR had conducted safety inspections which failed to show any defects in the electrical system ground. An independent electrical repair company, Bernie's, was also employed to conduct inspections and to remedy any potential violations or safety hazards. The evidence presented demonstrates only that Weber's sought to keep its workplace safe by complying with the necessary inspections and completing any recommended repairs. Thus, the only notice of the alleged improper ground came afterthe-fact, as a result of the intensive investigation conducted by MSHA .
 {¶ 38} In addition, the expert suggested that the electrocution would have been prevented by more training, safety equipment, or supervision provided to Tipton. These issues are pertinent only to Tipton's appreciation of the danger of working around electricity, not to Weber's knowledge of the additional hazard. The record shows that Tipton was fully trained on the operation and repair of the dredge pipeline, and knew of the potential danger from the power lines. Moreover, since he was an independent contractor, Pahl's, his employer, would have been responsible for any necessary training or supervision, not Weber. While Weber had a duty to provide a safe workplace under R.C.4101.11, nothing in the record shows that more training, safety equipment, or supervision would have assisted Weber in knowing or discovering the hazard from the alleged improper grounding of the electrical system.
 {¶ 39} An owner or occupier may be liable even in inherently dangerous work situations, however, when the owner or occupier of the premises actively or actually participates in the independent contractor's work. See, e.g., Hirschbach v. Cincinnati Gas Electric (1983), 6 Ohio St.3d 206, syllabus. "`Actively participated' means that the [one engaging the independent contractor] directed the activity which resulted in the injury and/or gave or denied permission for the critical acts that led to the employee's injury, rather than merely exercising a general supervisory role over the project. * * *." Bond,72 Ohio St.3d, 332, syllabus; see, e.g., Sopkovich, 81 Ohio St.3d, at 640
(merely exercising a general supervisory role over the project is insufficient to constitute active participation); Cafferkey v.Turner Constr. Co. (1986), 21 Ohio St.3d 110, 112-13, ("actual participation" includes giving or denying permission for the critical acts that led to the injury, and excludes a mere concern for safety); Hirschbach, supra, at 208, ("actual participation" includes "retaining sole control over the safety features necessary to eliminate the hazard").
 {¶ 40} Although Scott Blue, the Weber site manager, may have given Tipton his daily work assignments, there is no evidence that Weber ever supervised or controlled the manner in which Tipton performed the tasks he was engaged in. As a result, the record does not establish that Weber actively participated in or directed the critical acts which led to Tipton's death. As an independent contractor, Tipton himself was totally in control of de-energizing the power lines to the dredge and simply chose to by-pass the safety procedures.
 {¶ 41} In this case, since nothing in the record shows that Weber breached its duty to provide a safe workplace, Sandra Tipton did not establish the essential elements to prove negligence. There is no evidence that Weber breached its duty under R.C. 4101.11, since Tipton was performing inherently dangerous work, Weber's did not direct or control the performance of his job, and Weber's had no notice of the alleged defect in the ground conductor. Therefore, since no material facts remain in dispute and Weber is entitled to judgment as a matter of law, summary judgment was properly granted in favor of appellee Weber Sand and Gravel, Inc.
 {¶ 42} Appellant's second and third arguments regarding issues of comparative negligence and primary assumption of the risk are rendered moot.
 {¶ 43} The judgment of the Williams County Court of Common Pleas is affirmed. Pursuant to App.R. 24, court costs of this appeal are assessed to appellant.
Judgment Affirmed.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Handwork, P.J., Lanzinger, J., concur.
Singer, J., Concurs in Judgment Only.
[1] The trial court determined that R.C. 4101.01 did not "apply to this situation," but went on to refer to "any duty that Weber had to Curtis Tipton." In other words, even if a duty was owed under the frequenter statute, no breach of that duty could occur if the danger was open and obvious.
[2] The "kick out" wire was connected to a button on the dredge itself, which could be manually pushed to shut off the electricity to the dredge.
[3] In this case, the record indicates that Tipton was arguably an employee of Weber and was simply paid through Pahl's, a company owned by Weber. Since the parties do not dispute Tipton's status as an independent contractor, we presume it is because if he were considered an employee, any negligence issues arising from his employer would be encompassed in Workers' Compensation claims. See R.C. 4123.741; Balkonyi v. Ralston Purina Co.
(1985), 17 Ohio St.3d 154, 157 (employee is precluded from bringing an action for negligence against the employer where injuries are compensable under Workers' Compensation statutes). Therefore, we will consider the arguments based on the factual presumption that Tipton was an independent contractor.