DeLUCA et al., Appellants,

v.

BANCOHIO NATIONAL BANK, INC., Appellee; Rotondo et al., Appellees.

[Cite as *DeLuca v. BancOhio Natl. Bank, Inc.* (1991), 74 Ohio App.3d 233.]

Court of Appeals of Ohio,
Franklin County.

No. 90AP–1181.

Decided May 23, 1991.

234

*Steven E. Hillman,* for appellants.

*Vorys, Sater, Seymour & Pease, F. James Foley* and *Nelson A. Raust,* for appellee BancOhio National Bank, Inc.

PETREE, Judge.

This is an appeal from a judgment of the Franklin County Common Pleas Court, which granted a directed verdict for defendant BancOhio National Bank.[1] Plaintiffs Carolyn J. DeLuca and her daughter Jacqueline M. DeLuca assert two assignments of error:

"I. The trial court erred in that it should have granted the plaintiffs' motion for summary judgment.

"II. The trial court erred in granting the appellee's motion for a directed verdict."

This case involves a dispute over a $75,000 check allegedly given to Carolyn DeLuca on Friday, January 27, 1989 by decedent, Joseph G. Rotondo. At the time, decedent was a seventy-eight-year-old practicing attorney and Carolyn DeLuca was his secretary.

On Friday, January 27, 1989, decedent, who for years had suffered from emphysema, heart problems, and other ailments, felt very ill. He called Carolyn in the morning to take him to the hospital. They stopped first at his office. Despite his discomfort, he signed several blank payroll checks that were on his desk. Before they left for the hospital, decedent told Carolyn, who usually did the payroll banking, that he had one check for her in his desk.

At the hospital, decedent was treated in the emergency room. Carolyn remained with him and eventually her daughter Jacqueline arrived as well. Further, decedent's son, Eric P. Rotondo, also visited. Eric is an attorney practicing law in the same office as his father. Earlier that morning, Eric had seen the blank checks on his father's desk and had overheard his father's comment about a check left for Carolyn.

Carolyn was at decedent's side in his hospital room. At one point, she maintained that decedent told her that he wanted to pay her debts and asked her how much she needed. She told him that her debts were $75,000. So,

---

1. This cause was previously before this court in *DeLuca v. BancOhio Natl. Bank* (Nov. 30, 1989), Franklin App. No. 89AP–648, unreported, 1989 WL 145279.

decedent told her that if anything happened to him, she was to take the blank check in his desk and fill it in for that amount. No one else was present to hear this conversation.

Carolyn remained at the hospital until decedent died at 4:46 p.m. on Friday the 27th. The certificate of death indicates that decedent died of natural causes.

After decedent died, Carolyn returned to decedent's office to pick up some personal items, finish the payroll, and pick up her check. Subsequently, she went home.

Eric remained at the hospital to make funeral arrangements. When he returned to the law office, he noticed that the payroll checks were properly in their envelopes, except that one was missing.

Eventually, Carolyn filled in the blank check as decedent had instructed. She filled in her name as payee, the amount of $75,000, and the date. She then went to the Bexley branch of BancOhio with Jacqueline on Saturday, January 28, 1989. She presented the check to the next available teller, Kathleen R. Miller, who in fact was head teller. Carolyn indicated that she needed the funds deposited in her BancOhio account. After some discussion about the availability of the funds to pay bills, Miller told Carolyn that the funds would be available on the next banking day. Miller then deposited $75,000 into plaintiffs' account.

Thereafter, Eric, who is co-executor of his father's estate, learned about the transaction at BancOhio. He consulted an attorney who filed for an *ex parte* temporary restraining order ("TRO") on Monday, January 30, 1989 to stop payment on the check and the transfer of any funds. After the trial court granted this relief, the TRO was presented to BancOhio on Monday afternoon.

The bank then dishonored the check, removed a provisional credit from plaintiffs' account, recredited decedent's account, and returned the check to Carolyn with a stamp on it and an explanation that the check had been dishonored due to the TRO. Decedent's estate was then able to withdraw the $75,000 for the benefit of the estate.

Plaintiffs filed suit on March 22, 1989, alleging that BancOhio removed $75,000 from their joint bank account without authority to do so and refused to repay the funds. Both parties filed motions for summary judgment, but the trial court overruled them. At trial, at the close of plaintiffs' case, BancOhio orally moved for a directed verdict and the trial court granted it.

In findings of fact and conclusions of law the court wrote that BancOhio obeyed the TRO and dishonored the check. The court acknowledged that Carolyn " * * * took the check to defendant's Bexley branch to deposit the

funds in plaintiffs' savings account. * * *" But the court found that Carolyn did not inform the bank that the maker of the check was dead nor that she had completed the check " * * * by naming herself as payee and by inserting the amount of $75,000." The court concluded that the check was "* * * invalid, payment was properly denied, and the account of plaintiffs' was properly debited."

In their assignments of error, plaintiffs argue that BancOhio cashed the $75,000 check on Saturday and could not thereafter undo such final payment.

At the outset, we note that motions for directed verdict and motions for summary judgment are similar in that " * * * [i]n each instance, the evidence is construed most strongly in favor of the party against whom the motion is directed and the motion must be overruled unless from the evidence so construed reasonable minds could reach no other conclusion but that, under the applicable law, the movant is entitled to a judgment in his favor." *Rayburn v. J.C. Penney Outlet Store* (1982), 3 Ohio App.3d 463, 463–464, 3 OBR 544, 544, 445 N.E.2d 1167, 1168. However, "[m]otions for directed verdict and summary judgment directed against the plaintiff differ as to which party bears the risk of loss for not presenting evidence on all material determinative issues. A motion for directed verdict will be sustained if the plaintiff has not presented evidence on all such issues; whereas, a motion for summary judgment will be sustained only if the defendant presents evidence on all material determinative issues." *Id.* at syllabus.

In the first assignment of error, plaintiffs claim that summary judgment should have been granted in their favor. They submitted affidavits from Carolyn and Jacqueline DeLuca, documentary evidence arising from the check transaction, and depositions to establish that the bank cashed the check, which they argued was valid in every respect. By contrast, BancOhio submitted affidavits and other evidence to establish that Carolyn only deposited the check, which allowed the bank to revoke any provisional credit granted prior to its so-called midnight deadline. Because the submitted evidence was in dispute on material issues of fact, the trial court was correct in denying summary judgment to plaintiffs.

Consequently, plaintiffs' first assignment of error is not well taken.

■ In the second assignment of error, plaintiffs reiterate their argument that the check was cashed, but they now do so with respect to the verdict directed against them.

At trial, plaintiffs called two witness. The first witness was head teller Kathleen Miller. She testified that Carolyn DeLuca presented the check in question to her for payment on Saturday morning, January 28th. The bank

was open until 1:00 p.m. that day. At the time, Carolyn had over $47,000 in her own BancOhio savings account.

Initially, Carolyn presented a deposit slip to Miller indicating a deposit of the $75,000 check. After Carolyn asked about the availability of the funds to pay her bills, Miller indicated that she would have to check with her supervisor, Charlotte Rebecca ("Becky") Black, because of the amount of the check. Miller asked Black if she could show the check as being an all-cash deposit into plaintiffs' account, since the check was a BancOhio check. After checking decedent's account for sufficient funds, Black initialed the check and authorized the transaction. The deposit slip was changed to reflect a $75,000 deposit of "Currency" and the check-deposit indication was scratched out. Miller then electronically debited the Rotondo account and electronically credited plaintiff's account. It is undisputed that no money ever changed hands over the counter.

Miller testified that, as far as her Multikey terminal was concerned, the check was cashed. Indeed, the deposit slip was printed and coded to reflect an "04" sort, which is a bank sort for checks that have been cashed. The check itself contains two strips of printed code, one of which indicates the transaction type as being a "CSH CK."

Miller also identified a BancOhio publication sent to depositors. This publication, entitled "Your Ability to Withdraw Funds," indicates that for deposits by check, special rules apply. It further states that: "If you will need the funds from a deposit right away, you should ask us when the funds will be available."

Plaintiffs' second witness was Becky Black, Miller's supervisor who was in charge of bank operations on the day in question. She did not have any specific knowledge of the transaction in question, but she identified her initials on the check and said that she always reviews large checks and initials them.

Given these facts, BancOhio argues that plaintiffs failed to establish that the bank made final payment on the check. Rather, BancOhio argues that it only provisionally credited Carolyn's account. BancOhio therefore argues that it had until its midnight deadline on Tuesday to revoke the provisional credit on account of its receipt of the TRO on Monday.

The issue presented is whether there was sufficient evidence to establish that final payment was made under Ohio's Uniform Commercial Code. The instant case poses a question of first impression in Ohio.

In bank parlance, we are dealing with the cashing of a typical Saturday "on us" check. See Bailey, Brady on Bank Checks (1987) 15–5 to 15–6, Section

15.3. The lexicon of Articles 3 and 4 of the Uniform Commercial Code is more complex.

Here, BancOhio is a "bank" under R.C. 1301.01(D) [U.C.C. 1–201(4)]. In particular, BancOhio is a "payor bank" under R.C. 1304.01(A)(13) [U.C.C. 4–105(b)] because the check in question is an "item" under R.C. 1304.01(A)(7) [U.C.C. 4–104(1)(g)] and BancOhio is the bank by which the item was payable as drawn or accepted. Moreover, since BancOhio is the first bank to which the item was transferred for collection, it is also a "depository bank" under R.C. 1304.01(A)(12) [U.C.C. 4–105(a)].

Under Article 4, which governs bank deposits and collections, the payor bank has special liabilities among all banks because of the core concept of final payment. Though the concept is as ancient as the infamous case of *Price v. Neal* (1762), 3 Burr. 1354, the concept nevertheless serves as a fundamental foundation for determining payor bank liability under the code. Volume 5, Hawkland & Lawrence, Uniform Commercial Code Series (1984) 531, Section 4–213:01. For the payor bank, final payment is truly a milestone. Volume 1, White & Summers, Uniform Commercial Code (3 Ed. 1988) 922, Section 18–7.

R.C. 1304.19(A) [U.C.C. 4–213(1)] states that, upon final payment, the payor bank shall be "accountable" for the amount of the item. Division (A) provides that "[a]n item is finally paid by a payor bank when the bank has done any of the following, whichever happens first: (1) paid the item in cash; or (2) settled for the item without reserving a right to revoke the settlement and without having such right under statute, clearing house rule, or agreement; or (3) completed the process of posting the item to the indicated account of the drawer, maker, or other person to be charged therewith; or (4) made a provisional settlement for the item and failed to revoke the settlement in the time and manner permitted by statute, clearing house rule, or agreement."

BancOhio maintains that it did not pay the subject check in cash because Carolyn did not request or receive cash. It contends that its internal number and letter codes reflect a "depositing" and not a "cashing" transaction. Thus, BancOhio claims that it only gave Carolyn a provisional settlement and provisional credit for this transaction. BancOhio argues that, in fact, " * * * [n]o payment (whether provisional or final) was required on the banking day of the check's receipt. Instead, BancOhio was required only to decide whether the item would be dishonored by its midnight deadline."

First, we must note that under R.C. 1304.01(A)(10) [U.C.C. 4–104(1)(j)], the word " '[s]ettle' means to pay in cash, by clearing house settlement, in a charge or credit or by remittance, or otherwise as instructed. A settlement may be either provisional or final[.]" To be sure, R.C. 1304.21(A) [U.C.C. 4–

301(1) ], the deferred posting provision, allows a payor bank to make provisional settlements and revoke them unless the demand item is for "immediate payment over the counter." If the bank acts before the milestone of final payment, the bank may revoke a provisional settlement " * * * before midnight of the banking day of receipt * * *." R.C. 1304.01(A)(3) [U.C.C. 4–104(1)(c) ] defines "banking day" as " * * * that part of any day on which a bank is open to the public for carrying on substantially all of its banking functions[.]"

Contrary to BancOhio's contention, we are emphatically not dealing with a provisional settlement in this case. Rather, we are dealing with the issue of whether final payment was made.[2]

The deferred posting statute does not make every single credit given by the bank provisional in nature. One could never cash a check in the ordinary and certain sense of the term if this were true.

■ When one presents a check for payment at the drawee bank, how quickly must the bank pay it? R.C. 1303.61(B) [U.C.C. 3–506(2) ] states that, unless an earlier time is agreed to and given a reasonable time for examination, " * * * payment must be made *in any event* before the close of business on the day of presentment." (Emphasis added.) Hence, even though Saturday was not a banking day under the code or under the bank's rules, Saturday was the "day of presentment" and BancOhio had until close of business, 1:00 p.m. on Saturday to pay this "on us" check. It is irrelevant that, due to cut-off hour restrictions, Tuesday probably would have been BancOhio's midnight deadline for provisional settlements.

The fact that BancOhio had established a posted Friday cut-off hour does not, as the bank contends, make any settlement provisional. R.C. 1304.05 (U.C.C. 4–107) allows a bank to establish a cut-off hour for the purpose of processing items. As Kathleen Miller recognized, this means that after-hour transactions on Friday, and all Saturday transactions, are "Monday's work." As recognized in the detailed analysis by Hawkland & Lawrence, *supra,* this section merely provides a time of "receipt" for items and therefore, may alter a bank's midnight deadline. *Id.* at 279–283. However, it does not alter the final payment rule. " * * * Conflicts with stop orders, notices and setoffs are governed by time of payment, not time of receipt." *Id.* at 282. Consequently, as the statute provides, any item or deposit of money received after the cut-off hour may be treated as being received at the opening of the next banking

---

2. We note that BancOhio has not established that decedent's account was maintained at another branch. Hence, R.C. 1304.04's (U.C.C. 4–106) rules for separate branches are inapplicable.

day. Even if the transaction in question were deemed to be a Monday transaction, as BancOhio contends, this only means that if final payment occurred here it occurred on Monday morning for bank purposes, instead of on Saturday.

BancOhio nevertheless is adamant that final payment never was made here because it was a deposit of a check—which would be provisional—instead of a cashing of a check. The bank claims that the process of posting was never completed. See *Gibbs v. Gerberich* (1964), 1 Ohio App.2d 93, 30 O.O.2d 113, 203 N.E.2d 851. We need not reach the question of whether the process of posting was completed.

R.C. 1304.19 provides that an item is finally paid if it is paid in cash or alternatively, if it is settled without reserving the right to revoke. As the trial court noted, and as the evidence at trial revealed, Carolyn made presentment "to deposit the *funds*" into her account. (Emphasis added.) She intended to cash the check and Kathleen Miller purportedly did so. The deposit slip indicates a deposit of currency. *Cf. Kirby v. First & Merchants Natl. Bank* (1969), 210 Va. 88, 168 S.E.2d 273 (part payment of cash case). The only humanly intelligible codes on the check show that it was a cash deposit, though earlier bank affidavits claim that bank records and machine codes show a deposit of a check. How is one to decipher the secret codes of the bank?

Nevertheless, BancOhio bank argues that the check could not have been paid in cash because it is undisputed that no money changed hands. BancOhio conceded at oral argument that a teller would not have $75,000 in her drawer to hand over to a customer. Under BancOhio's construction of the term "paid in cash" in R.C. 1304.19(A)(1), money must cross over the counter into the hands of the customer. Here, this means that Miller would have to push $75,000 toward Carolyn and then, presumably, Carolyn would have to push it back.

Many courts have addressed the "paid in cash" question but we have not found a single case where anyone has made this argument. See Annotation, What Constitutes Final Payment Under UCC 4–213 (1983), 23 A.L.R.4th 203, Section 3.

We note that R.C. 1304.19(A)(1) does not say "payment in money." Money is a term of art defined in R.C. 1301.01(X) [U.C.C. 1–201(24)]. Nor does it say "paid in currency over the counter into the hands of the customer."

Under BancOhio's interpretation, the only way to ensure that immediate final payment is made on a substantial "on us" check is to buy a cashier's check to prove that cash was deposited. Indeed, many courts have held that the giving of a cashier's check is final payment because it is a cash equivalent.

See *Citizens & Southern Natl. Bank v. Youngblood* (1975), 135 Ga.App. 638, 219 S.E.2d 172; *Howard Bank v. Iron Kettle Restaurant of Bolton, Inc.* (1981), 139 Vt. 374, 428 A.2d 1138; *Hill v. Mercantile First Natl. Bank of Doniphan* (Mo.App.1985), 693 S.W.2d 285; *First Natl. Bank of Fort Worth v. United States* (1985), 8 Cl.Ct. 774. Cf. *Banco Ganadero v. Society Natl. Bank of Cleveland* (N.D.Ohio 1976), 418 F.Supp. 520. However, we decline to formulate a "cashier's check" doctrine. Indeed, if Carolyn had purchased a cashier's check, endorsed it, and then asked the bank to cash it and deposit the funds into her account, we would be right back where we started. BancOhio would claim that the cashier's check was deposited and might try to stop payment on it.

Sometimes the law establishes conclusive evidentiary rules requiring symbolic acts. The ancient common law once required delivery of a twig for livery of seisin. A key was required for a gift. A seal was required for a promise. By and large, though, the harsh and unsettling application of such rules only served to disrupt the legitimate intentions of the parties.

We see no efficacy in requiring the pushing of currency back and forth and we see no intent on the part of the drafters of the code to require such a rule in modern commercial law. To be sure, this is the twentieth century. This is the age of computers, of electronic communications, and of lightning-fast funds transfers.

The check in question was paid in cash without reserving the right to revoke. Accordingly, BancOhio made final payment and could not reverse this.

■ Notwithstanding, BancOhio argues that it acted properly by virtue of its good faith compliance with the TRO it received on Monday afternoon. The TRO ordered:

" * * * [T]hat defendants Carolyn and Jacqueline DeLuca be restrained from doing any act to gain control, dissipate or convert to their own use the $75,000 drawn upon the account of Joseph G. Rotondo (BancOhio National Bank Account Number 801–583998) for transfer to BancOhio account number 801–4026986 until further order of this court.

"It is further ordered that defendant BancOhio be restrained from transferring the referenced fund from the referenced account of Joseph G. Rotondo to the DeLuca account and further to cease to recognize any account transfers from any account of Joseph G. Rotondo without the consent and approval of the co-executors appointed by the Franklin County Probate Court. * * * "

As recognized, BancOhio made final payment in this case and therefore, a milestone in the payment process occurred. White & Summers, *supra.*

Consequently, as R.C. 1304.23(A) [U.C.C. 4–303(1)] provides, the "legal process" involved herein came "too late" to disrupt the transaction. See *Gibbs, supra;* See, also, *Tranarg v. Banca Commerciale Italiana* (1977), 90 Misc.2d 829, 396 N.Y.S.2d 761.

Despite this, BancOhio argues that it was compelled to act as it did because it interpreted the order as requiring such action by virtue of the language ordering that it "cease to recognize" any account transfers. As BancOhio interprets the TRO, it is a mandatory affirmative injunction to retrospectively reverse the transaction in question.

BancOhio also relies on the well-settled rule that, except for void orders, an injunction must be complied with until set aside, even if it is erroneous. *State ex rel. Beil v. Dota* (1958), 168 Ohio St. 315, 7 O.O.2d 36, 154 N.E.2d 634. See, also, 5A, Michie on Banks and Banking (1983) 334, Sections 110 and 111.

Assuredly, the nature of Civ.R. 65(A) temporary injunctive relief is to preserve the *status quo ante.* While the relief that was granted in this case is permissible, it is truly extraordinary and should be awarded only with the very greatest caution. Parties should rarely be able to obtain *ex parte* affirmative relief to accomplish the final object of their position in a dispute.

In light of this, we do not read the TRO here as requiring the bank to reverse the transaction. On its face, the TRO uses the "cease to recognize language" only after expressly referring to stopping the specific, referenced transfer. Thus, the "cease to recognize" language is used as a kind of catch-all with regard to any other transactions in the future or in progress.

We think the applicable rule in Ohio regarding situations like this is stated in *Taylor v. First Natl. Bank of Cincinnati* (1986), 31 Ohio App.3d 49, 31 OBR 88, 508 N.E.2d 1006. In *Taylor*, the bank received a facially valid probate court order requiring it to pay over a non-probate asset to an estate creditor in contravention of the bank's payable-on-death account contract. The *Taylor* court held that there was a genuine issue of material fact as to whether the bank violated its "duty of good faith and reasonable care" under the circumstances. *Id.* at 52, 31 OBR at 91, 508 N.E.2d at 1010.

■ Given this and given the fact that a directed verdict was granted on this basis without evidentiary resolution of the issue of the good faith and reasonable care of BancOhio, we conclude that the trial court erred.

■ BancOhio's last line of defense is based on the theory that plaintiffs breached their presentment warranty to the payor bank and therefore, it has a cause of action for the amount of the check which negates any recovery by plaintiffs. Though BancOhio bank merely presented this as an affirmative

defense in its answer, Civ.R. 8(C) provides that the court can treat an erroneously denominated defense as a counterclaim, if justice so requires.

Article Four's R.C. 1304.13 (U.C.C. 4–207), like Article Three's R.C. 1303.53 (U.C.C. 3–417), establishes certain presentment warranties given to good faith payors by customers obtaining payment on items. Division (A)(3) of R.C. 1304.13 provides that the customer warrants that "the item has not been materially altered, except that this warranty is not given by any customer or collecting bank that is a holder in due course and acts in good faith[.]" As R.C. 1303.14(B) [U.C.C. 3–115(2)] states with respect to incomplete instruments, if a completion is unauthorized the material alteration rules of R.C. 1303.43 (U.C.C. 3–407) apply. In turn, R.C. 1303.43(A) states that "[a]ny alteration of an instrument is material which changes the contract of any party thereto in any respect, including any such change in: * * * (2) an incomplete instrument, by completing it otherwise than as authorized[.]" R.C. 1301.01(QQ) [U.C.C. 1–201(43)] states that: " 'Unauthorized' signature or indorsement means one *made without actual, implied, or apparent authority* and includes a forgery." (Emphasis added.)

Here, BancOhio argues that Carolyn had no authority to fill in the incomplete check after decedent's death. On this score, we are compelled to agree.

In her deposition, Carolyn squarely admitted that the subject check was intended as a gift to her. As is evident from the deposition, it is at least arguable that decedent attempted to effectuate a gift *causa mortis* of the check in question. However, the law as it stands cannot permit this on these facts.

Lord Chancellor Ashbourne once said that: " * * * I do not look with particular favor on these death-bed gifts." *Duckworth v. Lee* (1899), 1 Ir.R. 405 (quoted in Williston, Gifts of Rights under Contracts in Writing by Delivery of the Writing [1930], 40 Yale L.J. 1, 13). The same sentiment applies in Ohio. *Gano v. Fisk* (1885), 43 Ohio St. 462, 3 N.E. 532, paragraph one of the syllabus.

Although such gifts are enforceable in Ohio, gifts by check pose a special problem. The almost uniform rule at common law was that a donor's own check not paid or accepted prior to death could not establish a gift *inter vivos* or *causa mortis*. Annotation, Donor's Own Check as Subject of Gift (1954), 38 A.L.R.2d 594. The same effect was said to obtain under the Negotiable Instruments Law. 1 Daniel, Negotiable Instruments (1933) 253, Section 204.

The theoretical underpinning for this rule is that a check is not an assignment of funds and therefore, any intended gift could not be complete because the donor retains the power to stop payment on his order. The code today

also provides that a check is not an assignment of funds. R.C. 1303.45 (U.C.C. 3–409).

Though some courts have considered a check for the entire amount of an account as an assignment of funds, the Supreme Court of Ohio appeared to reject this exception in *Simmons v. Cincinnati Sav. Soc.* (1877), 31 Ohio St. 457. In *Simmons*, a mother lying sick in her bed signed a blank check for the entire amount of her account two weeks before her death and sought to make a gift of it to her daughter, who had been caring for her. Though the mother completed the check before her death, her daughter did not present the check until after her mother's death. The estate's administrator then countermanded the check.

In affirming a judgment for the defendant bank, the *Simmons* court wrote in the syllabus:

"The drawer of a check delivered it to the payee, intending thereby to give to the payee the fund on which the check was drawn—*Held:* That until the check was either paid or accepted, the gift was incomplete; and that in the absence of such payment or acceptance, the death of the drawer operated, as against the payee, as a revocation of the check." (Emphasis *sic.*)

On the evidence presented, Carolyn's authority to fill in the check was revoked by decedent's death. Consequently, she breached the presentment warranty against material alterations. For this reason, the court should have directed a verdict for BancOhio.

Accordingly, plaintiffs' second assignment of error is not well taken.

Plaintiffs' assignments of error are overruled, and the judgment of the trial court is affirmed.

*Judgment affirmed.*

STRAUSBAUGH and REILLY, JJ., concur.

ARCHER E. REILLY, J., retired, of the Tenth Appellate District, sitting by assignment.