WYCZALEK, Successor Admr., Appellant and Cross–Appellee,

v.

ROWE CONSTRUCTION SERVICES COMPANY,
INC. et al., Appellees and Cross–Appellants.

[Cite as *Wyczalek v. Rowe Constr. Serv. Co.*, 148 Ohio App.3d 328, 2001-Ohio-3104.]

Court of Appeals of Ohio,
Sixth District, Erie County.

No. E–00–059.

Decided Dec. 21, 2001.

Ralph C. Pisano, Jr., Thomas J. Murray and Mary O'Neill, for appellant and cross-appellee.

James R. Jeffery and Teresa L. Grigsby, for appellees and cross-appellants Rowe Construction Serices Company, Inc., and Simms Construction Services Company, Inc.

John Martindale, Margaret Mary Meko, Larry L. Simms, Thomas G. Hungar and Brian C. Goebel, for appellee and cross-appellant Meijer, Inc.

Irene C. Keyse–Walker, for appellee and cross-appellant Elford, Inc.

MELVIN L. RESNICK, Judge.

{¶ 1} The appeal and cross-appeals filed in this case challenge judgments entered by the Erie County Court of Common Pleas on motions for summary judgment, on jury verdicts, and on a motion for prejudgment interest. For ease of discussion, we divide this decision into separate sections.

## THE UNDISPUTED FACTS

{¶ 2} In 1994, appellee and cross-appellant, Meijer, Inc. ("Meijer"), which owns and operates a chain of combined department and grocery stores, decided to construct a Meijer store in Sandusky, Erie County, Ohio. Meijer hired appellee and cross-appellant, Elford, Inc. ("Elford") to serve as its construction manager on this project. Appellee and cross-appellant, Simms Construction Services, Inc. ("Simms"), was the lowest qualified bidder for the steel erection work on the project and, after negotiations with Meijer and Elford, was awarded the contract for this work.

{¶ 3} The actual steel erection work was, however, performed by appellee and cross-appellant, Rowe Construction Services, Inc. ("Rowe"), which, at the time of the project, had recently entered into a joint venture with Simms. This fact was unknown by Meijer and Elford at the time of performance. They believed that only Simms was performing the steel work. In fact, the ironworkers at the project site had Simms Construction on their hard hats and T-shirts.

{¶ 4} Rowe performed the erection of the steel frame for the Meijer store in the following sequence. First, the "raising gang" bolted two lines of steel columns in place to form a row. Then steel joist girders were connected to the columns and bolted in place. Third, bar joists, which serve as a base for steel

roof decking, were positioned, by hand, between and on top of the girders. The joists were, however, not welded or bridged at this time. Finally, bundles of decking, weighing approximately 3,000 to 4,000 pounds, were placed at points "right at the girder." The store was divided into four quadrants for the purpose of construction. A "detail crew" followed and welded and bridged the joists. The detail crew was usually "one or two" bays behind the erection crew.

{¶ 5} As of August 18, 1994, anywhere from eighty to ninety-five percent of the steel erection work was complete. Nevertheless, it is undisputed that a large portion of this steel framework was unbridged and unwelded. Arthur Feiler, an employee of All Erection and Crane Rental, was a crane operator for the project. On this particular morning he was lifting joists and decking to be placed on the girders in one of the bays. The decedent, Christopher Dellinger, who was hired by Rowe, and Timothy Huey, both experienced ironworkers, were working at a height of approximately twenty feet, positioning the joists and bundles of decking on the steel girders. After the two men completed their work on one of the bays, Feiler realized that one or more of the joists on that bay were moving or leaning to one side from the weight of the bundles of decking. Romeo A. Rowe, the field manager and President of Rowe, described the movement as "bowing" or "rolling."

{¶ 6} It was decided that, to prevent an accident, Dellinger and Huey would return to the unstable area to hook the bundles of decking to the crane and remove them from the joists. Then the joists would also be removed for testing. During this process, Christopher Dellinger fell to the ground. A bundle of decking also fell and a portion landed on Dellinger, causing his fatal injuries.

## PROCEDURAL HISTORY

{¶ 7} Appellant and cross-appellee, Dawn Wyczalek, administrator of the estate of Christopher G. Dellinger ("Estate"), commenced the instant action against Rowe, Simms, Meijer, Elford, All States Steel Erecting, Inc. ("All States"), and Vulcraft Sales Corp., seeking compensatory and punitive damages for the wrongful death of her brother. The claim against Vulcraft Sales Corporation was later voluntarily dismissed, without prejudice.

{¶ 8} In its amended complaint, the Estate alleged that Rowe, as the decedent's employer, committed an intentional tort by ordering Christopher Dellinger to perform work under circumstances in which Rowe was substantially certain that Dellinger would be injured. The Estate claimed that Simms, as a joint venturer with Rowe, was also liable under the theory of employer intentional tort. As to Meijer, Elford, and All States, appellant set forth claims of negligence and negligent hiring. The Estate also requested punitive damages.

{¶ 9} Rowe and Simms filed a joint answer and, later, sought leave to file a first amended answer that included a "cross-claim" against All Erection and Crane Rental. The trial court granted this motion. However, realizing that their claim against All Erection and Crane Rental was actually a third-party complaint, Rowe and Simms again filed a motion to amend. The trial court denied this motion.

{¶ 10} Meijer filed a separate answer and asserted cross-claims against All States, Rowe, and Simms. Likewise, Elford filed an answer and cross-claims against All States, Rowe, and Simms. All States never answered, and the claim and cross-claims against this defendant were never determined or dismissed. However, upon a remand from this court to the lower court, the claim and cross-claims against All States were dismissed, with prejudice.

{¶ 11} Meijer and Elford filed a joint motion for summary judgment; Rowe and Simms filed a motion for summary judgment. The trial court denied these motions. Following a trial on liability, Meijer and Elford requested a directed verdict; this request was denied. The jury entered verdicts in favor of the Estate as against Meijer, Elford, Rowe, and Simms, and awarded the Estate compensatory damages in the amount of $2,500,000. The jury also found that the defendants were liable for punitive damages. After a separate hearing, the jury returned a verdict imposing $10,000,000 in punitive damages on Meijer, $1,000,000 in punitive damages on Elford, and $1.00 in punitive damages on Rowe and Simms.

{¶ 12} Rowe and Simms filed a motion for a judgment notwithstanding the verdict. The trial court entered judgment on the jury's verdict. The Estate filed motions for prejudgment interest and the assessment of attorney fees. Meijer and Elford dismissed, without prejudice, their cross-claims against Rowe and Simms. Meijer and Elford also filed a notice of appeal; however, we dismissed their appeal for lack of a final, appealable order. On November 1, 2000, the trial court entered a judgment denying the motion for prejudgment interest, denying the motion for a judgment notwithstanding the verdict, and ordering the defendants to pay plaintiff's attorney fees in the amount of $142,633.50. These timely appeal and cross-appeals followed.

## MEIJER AND ELFORD'S CROSS–APPEALS

{¶ 13} The two bases for the estate's wrongful death action against both Meijer and Elford are negligence and negligent hiring. In the proceedings in the trial court, Meijer and Elford filed a combined motion for summary judgment on these claims and both requested a directed verdict on the same at trial. Even though each filed a separate brief on cross-appeal, they raise identical assign-

ments of error. Thus, their cross-appeals shall be considered together. In their first assignments of error, Meijer and Elford assert:

{¶ 14} "The trial court erroneously denied defendant-cross-appellant [Meijer, Inc.'s] Elford, Inc.'s motion for summary judgment (Docket No. 61, Sec. 1, 1997) and motion for a directed verdict (Tr. at 933–947)."

## SUMMARY JUDGMENT AND DIRECTED VERDICT STANDARDS

{¶ 15} This court engages in a de novo review of the lower court's grant of summary judgment. *Brown v. Scioto Cty. Bd. of Commrs.* (1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153. Civ.R. 56(C) provides that summary judgment can be granted only if (1) no genuine issue of material fact remains to be litigated; (2) viewing the evidence in a light most favorable to the nonmoving party, reasonable minds can reach but one conclusion and that conclusion is adverse to the nonmoving party; and (3) the moving party is entitled to summary judgment as a matter of law. *Horton v. Harwick Chem. Corp.* (1995), 73 Ohio St.3d 679, 653 N.E.2d 1196, paragraph three of the syllabus.

{¶ 16} The motion for a directed verdict presents a similar standard of review, the only difference being that Meijer and Elford bore the initial burden of setting forth a basis for the motion for summary judgment while the Estate bore the burden of presenting evidence at trial. *DeLuca v. BancOhio Natl. Bank, Inc.* (1991), 74 Ohio App.3d 233, 237, 598 N.E.2d 781. Because both motions involve similar standards of review (whether reasonable minds could come to but one conclusion based upon the evidence), we will not independently analyze the evidence presented on behalf of both motions.

### Negligence Claim–Frequenter Statute

{¶ 17} The essential elements of a negligence cause of action are duty, breach of duty, causation, and damages. *Anderson v. St. Francis–St. George Hosp., Inc.* (1996), 77 Ohio St.3d 82, 84, 671 N.E.2d 225. The crux of Meijer's and Elford's argument in the instant case is the Estate's alleged failure to demonstrate a genuine issue of material fact as to any duty owed by them to the decedent on summary judgment or to establish such a duty at trial.

{¶ 18} R.C. 4101.11 and 4101.12 require every employer to furnish a safe workplace for his employees and for frequenters. A "frequenter" is any person "other than an employee, who may go in or be in a place of employment under circumstances which render him other than a trespasser." R.C. 4121.01(E), as effective during the relevant period. As an employee of a subcontractor erecting steel on the Sandusky Meijer site, Christopher Dellinger was a frequenter and entitled to a safe workplace under the statutes.

{¶ 19} Nevertheless, in *Wellman v. E. Ohio Gas Co.* (1953), 160 Ohio St. 103, 51 O.O. 27, 113 N.E.2d 629, paragraph one of the syllabus, the Ohio Supreme Court held:

{¶ 20} "Where an independent contractor undertakes to do work for another in the very doing of which there are elements of real or potential danger and one of such contractor's employees is injured as an incident to the performance of the work, no liability for such injury ordinarily attaches to the one who engaged the services of the independent contractor."

{¶ 21} In other words, when an employee of a subcontractor is injured while performing work for his or her employer that is inherently dangerous, the owner and/or general contractor owes no duty of care to that employee. *Sopkovich v. Ohio Edison Co.* (1998), 81 Ohio St.3d 628, 636–637, 693 N.E.2d 233, quoting *Wellman* at paragraphs one and two of the syllabus. There can be no dispute with regard to the fact that Christopher Dellinger was engaged in an inherently dangerous job, a construction job, see *Bond v. Howard Corp.* (1995), 72 Ohio St.3d 332, 336, 650 N.E.2d 416, working at heights of up to, in this case, twenty-two feet and while handling heavy steel construction materials. Thus, it appears at first blush that neither Meijer nor Elford owed Dellinger a duty of care.

{¶ 22} Nonetheless, an exception exists to the general rule of "no duty." The exception occurs when the owner and/or general contractor or, in this case, construction manager, actively participates in the subcontractor's job operations by either directing or exercising "control over the work activities of the independent contractor's employees"; or "retaining or exercising control over a critical variable in the workplace." *Sopkovich v. Ohio Edison Co.*, 81 Ohio St.3d at 642–643, 693 N.E.2d 233.

{¶ 23} However, an owner/occupier or construction manager, who has less involvement with the field operations on a day-to-day basis, does not rise to the level of active participation when it merely exercises a general supervisory role over a project. *Bond v. Howard Corp.*, 72 Ohio St.3d at the syllabus. Rather, the owner/occupier or construction manager must have directed the activity that resulted in the injury and/or given permission for the critical acts that led to the employee's injury. Id. Moreover, liability for "active participation" as applied to an instance where it is alleged that the owner/occupier or construction manager controlled a critical aspect of the working environment is limited to a specific breach of duty that the owner/occupier or construction manager undertook to perform. *Sopkovich* at 643, 693 N.E.2d 233.

{¶ 24} In their motion for summary judgment, Meijer and Elford argued that under the contract that governed their relationship with any trade contractor,

they were not responsible for the "means, methods or procedures used by any trade contractor and did not provide continuous supervision of their work." Meijer and Elford also asserted that each trade contractor was required to submit a safety plan and designate a safety superintendent. Simms submitted a safety plan and Romeo Rowe was the designated safety superintendent, who conducted weekly safety talks, as required by the contract.

{¶ 25} Meijer and Elford further maintained that they did not actively participate in the work of the Simms/Rowe employees because they exercised no control over their work activities or control over a critical aspect of their work environment. Thus, they contended, in essence, that they owed no duty of care to Christopher Dellinger.

{¶ 26} In response, the Estate asserted that Simms'/Rowe's method of erecting steel was in complete disregard of industry standards, violated the law, and was contrary to the manufacturers' instructions and highly dangerous. According to the Estate, Meijer and Elford actively participated in controlling the method, means, and mode of the steel erection of the Sandusky Meijer store because they knew of the unsafe manner in which Simms/Rowe erected steel. Therefore, they knew that if they exerted economic duress, Simms/Rowe would "complete the job in the way they demanded." The Estate also urged that Meijer and Elford "actually participated" in the erection of the steel because they represented that safety on the job site would be a "joint undertaking" and did so through Miles Hardesty, Elford's job site superintendent.

{¶ 27} The following relevant facts are taken from the evidence adduced by means of summary judgment and at trial. Though this recitation of the facts offered is somewhat repetitious at times, we conclude that in light of the inferences reached by the Estate to support their arguments, recapitulation of these facts as revealed by the persons involved is necessary.

{¶ 28} According to Thomas J. Fitzpatrick, Chairman and CEO of Elford, contracts for the construction of various portions of Meijer projects are awarded to the lowest qualified bidder. All of the bids for steel erection of the Sandusky Meijer were higher than the allotted budget amount. Therefore, Meijer and Elford negotiated with Jerry L. Simms III of Simms Steel Construction, who consented to the inclusion of only straight time in his bid.

{¶ 29} In return, Meijer assumed the risk of paying overtime, if necessary, to Simms' employees. The rationale for this agreement was that Meijer and Elford believed that the bidders were including more overtime costs than necessary in their bids. Therefore, Meijer would rather accept a bid that was not in excess of the budget for the project and then pay for the actual cost of overtime.

{¶ 30}  Fitzpatrick also stated that early in the Sandusky Meijer project, Miles Hardesty acted both as Elford's on-site Superintendent and as the Quality Assurance Manager.  As superintendent, Hardesty worked in the on-site office to answer the telephone and to "facilitate communications between the owner, the design professionals and the trade contractors."  He also kept a "current log of all current contract documents."  As Quality Assurance Manager, it was Hardesty's job to ensure that materials arrived at the project site in a timely and orderly fashion, and to inspect those materials solely for the purpose of determining whether they met job specifications.

{¶ 31}  Miles O. Hardesty corroborated Fitzpatrick's testimony.  He stated that Romeo Rowe was the manager/superintendent responsible for Simms' safety plan within the meaning of its contract with Elford.  He further asserted that it was not part of his duties to supervise how the steel framework was erected.

{¶ 32}  Bruce E. Garmon, Sr., Meijer's Project Manager, testified that the contract between Meijer and Elford made Elford responsible for safety on the construction site.  He stated that, in turn, the contracts between Elford and the suppliers and trade contractors made those entities responsible for the safety of their employees on the site.

{¶ 33}  Garmon confirmed that Simms' bid, while being the lowest bid, was higher than the amount budgeted by Meijer.  Nevertheless, at a meeting in Columbus, Ohio, a compromise was reached.  According to Garmon, Simms was awarded the job of erecting the steel for a second Meijer store in Lancaster, Ohio, and, in exchange, Simms agreed to reduce the original bid of $275,000 on the Sandusky store to $225,000, a figure that was still over the budget for this particular project.  Garmon said that, in addition, Meijer agreed to pay for any overtime for man-hours or for additional crane time.  This was accomplished through "change orders" that were approved by Elford and Garmon.

{¶ 34}  Daniel A. Leverington was the Project Manager for Elford.  Elford previously acted as the Construction Manager on numerous Meijer Projects.  Leverington contacted twenty steel erecting businesses in northern Ohio and invited them to pre-qualify for Meijer's Sandusky Project.  One of the companies that he contacted was Simms Steel Services Company, which was owned and operated by the father of Jerry Simms III.  Leverington previously worked with the elder Simms on a project when he, that is, Leverington, was employed by another company.  The budget for the Sandusky Meijer Store was $185,000.

{¶ 35}  Leverington asked Jerry III whether he would be using any subcontractors, a fact that all trade contractors were supposed to reveal in writing.  Jerry III replied that he was subcontracting the deck work, but did not mention any subcontract to Rowe.  According to Leverington, prior to the accident, he knew Romeo Rowe only as the ironworker foreman.

{¶ 36} The testimony of Jerry III revealed the following information. Jerry's father, Jerry Simms II, owns and operates Simms Steel Services, a steel erection company. Prior to his graduation from college in 1989, Jerry III worked as an ironworker. Upon his graduation from college, he joined his father's company as an "estimator." His job was to prepare bids for the steel erection jobs and negotiate a contract for Simms Steel Services. According to Jerry III, he prepared "thousands" of such bids.

{¶ 37} In June 1994, Jerry III formed his own business, Simms Construction Services Company. He described his business as being a "broker" for subcontractors in the field of steel erection. Prior to successfully bidding for the Sandusky Meijer project, he bid on and won two other steel erection projects, both of which he subcontracted to Rowe.

{¶ 38} The younger Simms' initial bid on the Sandusky project was $275,000. Although he was informed by Elford that this was the lowest bid, he was also told that this figure was $90,000 over the amount that Meijer had budgeted for the steel erection portion of the construction. Jerry III stated that in his experience in bidding for other jobs, this happened "just about every time." Jerry III met with Leverington and Garmon to negotiate a figure acceptable to Meijer. Jerry III noted that he did not feel pressured during these negotiations. Instead, he disagreed with the cuts proposed by Leverington and Garmon and came up with his own solution. Jerry III offered to decrease the cost of labor in the bid figure, as well as the cost for renting a crane used for lifting the steel, thereby lowering the listed contract price to $225,000, a figure that Meijer could agree to. However, Jerry III would keep track of costs, including overtime, incurred on a daily basis, file a "change order" and "they," meaning Elford and Meijer, would approve the amounts over and above the bid price. Leverington and Garmon accepted this plan, and, during the course of the construction approved the change orders. Jerry III testified that the total amount received by Simms for the steel erection was $269,000. He also was awarded the steel work on the Lancaster Meijer as part of the deal.

{¶ 39} As stated previously, Simms Steel Construction did not perform the actual erection of the steel on the Sandusky Meijer. Rather, Jerry III "subcontracted" the job to Rowe. Nevertheless, Simms and Rowe shared the same office, and Jerry III and Romeo Rowe, the principal shareholder in Rowe, were officers in each other's corporations. In addition, Jerry III held forty-nine percent of the shares in Rowe. Jerry III admitted that he never informed Elford or Meijer of the fact that Rowe was doing the actual steel erection work.

{¶ 40} According to Jerry III, the construction commenced on August 1, 1994. The actual framework of the main part of the store was scheduled to be completed in four weeks. Despite delays, such as those caused by rain or crane

breakdowns, considered normal by Jerry III, he believed that construction was on schedule at the time of the accident. Additionally, Jerry III was not bothered by the fact that some of the materials needed for the construction were delivered out of sequence. The workers simply unloaded the materials needed for quadrants one through four and placed them in their proper locations. Finally, Jerry III maintained that he spoke with almost all of the workers on-site and no one had a complaint.

{¶ 41} Under the contract entered into between Elford and all trade contractors, the individual trade contractor is required "to supervise and direct its particular scope of Store Work." The contract states that the trade contractor shall control the construction "means, methods, techniques, sequences and procedures" used to erect the steel as well as compliance with OSHA requirements "and/or * * * any similar state law."

{¶ 42} The safety section of the contract then went on to enumerate specific steps that must be taken by the trade contractor as part of the development and implementation of a safety plan. The trade contractor must conduct weekly safety meetings. According to Fitzpatrick, Elford personnel do not attend these meetings; their only job is to observe to determine that the trade contractors institute and implement safety plans. As to any violation of OSHA, that is, Occupational Safety & Health Administration regulations, Elford's only duty is to notify OSHA.

{¶ 43} It is undisputed that after Simms was awarded the job, its contract was assigned to All States, which was technically the trade contractor for the steel work. Thus, Simms was a subcontractor to All States and was paid by All States. Consequently, while Elford and Meijer selected Simms, the assignment could not be made without All States' approval.

{¶ 44} Romeo Rowe confirmed the fact that Meijer and Elford had no input as to how the steel framework for the store was erected. He further stated that Rowe provided a safety manual to the ironworkers, that weekly safety talks, also called toolbox talks, were conducted by Rowe, and that there were daily safety inspections by Rowe. Romeo indicated that nothing unusual occurred during the course of this construction, except for the accident that killed Dellinger, that the sequence of the delivery of materials did not have a negative impact, that he was not pressured to finish on schedule, and that the steel erection was on schedule, at the time of the accident.

{¶ 45} After the accident, OSHA conducted an investigation and issued several violations of OSHA regulations to Rowe. The "serious" violation that serves as the crux of the case at bar was Rowe's failure to bridge and/or weld bar joists prior to placing roof decking on them.

{¶ 46}  Contrary to the Estate's version of the "facts," the record fails to reveal any evidence upon which reasonable minds could conclude that Meijer and/or Elford directed any of Rowe's work activities or retained control over any critical aspect of the work environment.  First, the Estate failed to offer any evidence of the fact that either Meijer or Elford directed the critical act, that is, the removal of the decking, that led to Christopher Dellinger's injury, or controlled and/or gave permission for that act.  Nor did the Estate offer any relevant facts, or reasonable inferences therefrom, from which it could be inferred that Meijer and Elford controlled the critical aspect of the work environment, in this case, the failure to bridge or weld joists, that led to this injury.

{¶ 47}  In addition, the record does not reveal facts upon which inferences of "economic duress," fraud, or any of the other conclusory allegations relied upon by the Estate can be made in order to create questions of fact on the issue of active participation.  To the contrary, the record discloses that Jerry Simms III was an experienced ironworker and skilled negotiator and that the contract entered into for steel erection was an arm's-length agreement between three knowledgeable business entities.

{¶ 48}  The facts offered also revealed that neither Jerry III nor Romeo Rowe felt pressured by the schedule for erecting the framework for the main portion of the Sandusky Meijer or believed that the schedule was delayed.  Moreover, the Estate failed to offer any facts showing that Meijer or Elford directed, much less knew, either before bidding or during construction at the Sandusky Meijer, of the "sequence" in which Rowe erected steel.

{¶ 49}  Further, the only facts before the court and jury indicated that, both as a matter of contract and of policy at the construction site, Meijer and Elford did not control the method and means in which the steel was erected or assume a duty of maintaining safety procedures on the work site.  Accordingly, reasonable minds could only conclude that because they owed no duty to Christopher Dellinger, Meijer and Elford were entitled either to summary judgment or a directed verdict on the claim of negligence as a matter of law.

### Negligent Hiring Claim

{¶ 50}  In Ohio, a subcontractor's employee may not maintain an action against a principal for negligent hiring.  *Best v. Energized Substation Serv., Inc.* (1993), 88 Ohio App.3d 109, 115, 623 N.E.2d 158.  See, also, *Abbott v. Jarrett Reclamation Serv., Inc.* (1999), 132 Ohio App.3d 729, 746, 726 N.E.2d 511.  For a cogent discussion of the rationale underlying the preclusion of such claims against an owner or general contractor or construction manager, we direct the reader's attention to this court's decision in *Curless v. Lathrop* (1989), 65 Ohio

App.3d 377, 392–393, 583 N.E.2d 1367 (explained in the context of finding that an independent contractor's employee could not assert a claim of vicarious liability against an owner). Accordingly, the trial court erred as a matter of law in denying Meijer's and Elford's combined motion for summary judgment or the motion for a directed verdict on the Estate's negligent hiring claim. Meijer's and Elford's first assignments of error are found well taken.

{¶ 51} Due to our disposition of Meijer's and Elford's first assignments of error, their second, third, fourth, and fifth assignments of error are moot, and we need not reach the merits of those assignments.

## SIMMS' AND ROWE'S CROSS–APPEALS

{¶ 52} Simms and Rowe assert, among other things, that the following error occurred in the proceedings below:

{¶ 53} "The trial court erred by failing to enter judgment in favor of defendants Rowe Construction Services Co., Inc. and Simms Construction Services Co., Inc. in accordance with the jury's original verdict in their favor, which verdict was consistent with jury interrogatories pertaining to liability. The trial court's decision to require further deliberations, and the instructions given with respect to those deliberations were erroneous."

## INCONSISTENT INTERROGATORIES

{¶ 54} In their Assignment of Error I, Rowe and Simms make a two-part argument with regard to the manner in which the trial court dealt with an interrogatory that conflicted with both the general verdict and with at least one other interrogatory.

{¶ 55} First, they argue that the trial court erred in failing to reconcile the allegedly inconsistent interrogatory with the general verdict. Second, they contend that the court erred in its instructions when returning this matter to the jury for further consideration.

{¶ 56} Initially, we turn to the jury instructions provided, without objection, by the court on the issue of damages. The relevant provisions read:

{¶ 57} "Now, if you find for the plaintiff, you will determine what sum of money will compensate the beneficiaries for the injury and loss to them resulting by reason of the wrongful death of Christopher Dellinger."

{¶ 58} The court then went on to enumerate all factors of compensatory damages existing at the time of Christopher Dellinger's death. Immediately thereafter, the trial judge gave the following instruction:

{¶ 59} "Now, you will also decide whether the defendants shall be liable for punitive damages in addition to any other damages that you might award the plaintiff.

{¶ 60} "The purpose of punitive damages [is] to punish the offending party, and to make it pay an example to discourage others from similar conduct.

{¶ 61} "You may find that any or all of the defendants is or are liable for punitive damages if you find by clear and convincing evidence that the defendants' acts or failure to act demonstrated malice, and the plaintiff has presented proof of actual damages that resulted from those acts or failures to act of the defendants, their agents or employees."

{¶ 62} The judge then defined "clear and convincing," "malice," and "substantial." She concluded this portion of the jury instructions by saying:

{¶ 63} "Now, if you find as to any defendant that its acts or omissions constituted conscious disregard for the rights and safety of Christopher Dellinger, that had a great probability of causing substantial harm, then you may find as to that defendant that punitive damages should be assessed."

{¶ 64} In addition to the jury instructions, the trial court discussed the general verdict forms and thirteen interrogatories, as requested by Meijer and Elford and revised by the court, to be used by the jury. Interrogatory H reads: "Do you find that the acts or omissions of Rowe Construction Services, Inc. and/or Simms Construction Services, Inc. pertaining to the erection of steel at the Meijer Project in Sandusky, Ohio constituted an intentional tort?" The court instructed the jurors that if they answered "No" to Interrogatory H, they should sign the general verdict form in favor of Rowe and Simms and that they should skip Interrogatory I. Interrogatory I addresses the issue of whether Rowe and Simms' acts or omissions constituting an intentional tort were the direct or proximate cause of the injury or death of Christopher Dellinger.

{¶ 65} The jury was told to move on to Interrogatory J if it found *any* of the defendants liable; otherwise, the jury's deliberations were complete. Interrogatory J queries the jury as to the total amount of compensatory damages.

{¶ 66} The jury was also given interrogatories regarding liability for punitive damages. Interrogatory M, asks: "Do you find by clear and convincing evidence that defendants Simms and/or Rowe should be liable for punitive damages?" The jurors were not instructed that their answer to Interrogatories H and I must be "Yes" before the question of liability for punitive damages could be determined.

{¶ 67} After deliberations, the jury returned a general verdict finding in favor of Rowe and Simms. In conformity with the general verdict, the jury circled the word "No" in answer to the liability question posed in Interrogatory H. However, in answer to Interrogatory M, the jury circled the word "Yes." All eight

jurors signed the general verdict and the material interrogatories. The court noted the apparent inconsistency between Interrogatories H and M; trial counsel for the Estate insisted that they had to be returned to the jury to correct that inconsistency. Counsel for Rowe and Simms objected, asserting that the general verdict and the answer to Interrogatory H, which addressed the issue of liability, were consistent and that the court should simply direct the jurors to find that they could not award punitive damages against Rowe and Simms.

{¶ 68} The trial judge opted to return the case against Rowe and Simms to the jury for further consideration. In returning the case for further consideration, the court gave the jury the following instruction:

{¶ 69} "All right. Ladies and gentlemen, there appears to be an inconsistency in your answers to Interrogatory H and Interrogatory M.

{¶ 70} "Now, in H if you find that there is no intentional tort that has been committed by Rowe and Simms, there can be no punitive damages awarded to the plaintiff as to Rowe and Simms.

{¶ 71} "And so therefore it appears to be—there appears to be an inconsistency with those two interrogatory answers because you have answered yes to punitive damages as to Rowe and Simms in Interrogatory M.

{¶ 72} "So with that we're going to send you back into the jury room with those two interrogatories, and also we will send you the verdict form that pertains to Rowe and Simms."

{¶ 73} After further deliberation, the jury returned a general verdict in favor of the Estate, found Rowe and Simms liable under Interrogatory H and, once again, answered "Yes" to Interrogatory M. Then, during the polling of the jury on their interrogatory answers, the judge realized that Interrogatory I was blank. Therefore, the court told the jury to once again retire and determine "proximate cause." The jury then entered a "Yes" vote to Interrogatory I. Only six members of the jury signed the general verdict and Interrogatories H, I, and M.

{¶ 74} Civ.R. 49(B) states:

{¶ 75} "When the general verdict and the answers are consistent, the appropriate judgment upon the verdict and answers shall be entered pursuant to Rule 58. When one or more of the answers is inconsistent with the general verdict, judgment may be entered pursuant to Rule 58 in accordance with the answers, notwithstanding the general verdict, or the court may return the jury for further consideration of its answers and verdict or may order a new trial."

{¶ 76} Because the trial court treated the jury's answers to the relevant interrogatories as creating only inconsistencies between these interrogatories, we must first determine whether Civ.R. 49(B) is applicable to this cause.

{¶ 77} Prior to the enactment of the Ohio Civil Rules of Procedure, jury answers to interrogatories that were inconsistent or in direct conflict with on another on the same issue canceled each other. *Klever v. Reid Bros. Express, Inc.* (1949), 151 Ohio St. 467, 39 O.O. 280, 86 N.E.2d 608, paragraph three of the syllabus. Thus, when faced with allegedly inconsistent answers to interrogatories, a trial court was initially required to attempt to harmonize or reconcile the answers. Id. at 476, 39 O.O. 280, 86 N.E.2d 608. When the answers could not be reconciled, the court was to disregard these interrogatories and enter judgment on the general verdict. Id.

{¶ 78} After the enactment of the Ohio Civil Rules of Procedure, the Tenth District Court of Appeals determined that Civ.R. 49(B) is inapplicable in cases where interrogatories are inconsistent with both the general verdict and with each other. See *Caserta v. Allstate Ins. Co.* (July 23, 1985), Franklin App. No. 84AP-1036, 1985 WL 10083. While the Tenth District court later reaffirmed this position, *Thornton v. Parker* (1995), 100 Ohio App.3d 743, 654 N.E.2d 1282, it appears from a reading of that court's most recent decision on this issue that the court determined that Civ.R. 49(B) is inapplicable only in those instances where answers to subparts of an interrogatory are "internally inconsistent," *Davis v. Columbus* (June 15, 1999), Franklin App. No. 98AP-1058, 1999 WL 394862. Whether or not this latest finding overrules the Tenth District's holding in prior cases, we decline to adopt this approach.

{¶ 79} Instead, we find the decision of the Second District Court of Appeals on this issue most instructive and persuasive. See *Phillips v. Dayton Power & Light Co.* (1996), 111 Ohio App.3d 433, 676 N.E.2d 565. In finding that Civ.R. 49(B) applied when it was argued that jury answers to special interrogatories were inconsistent, the *Phillips* court looked to the policy underlying Civ.R. 49. Id. at 446, 676 N.E.2d 565.

{¶ 80} The purpose of using jury interrogatories is twofold. First, they are employed to test the general verdict. *Colvin v. Abbey's Restaurant, Inc.* (1999), 85 Ohio St.3d 535, 538, 709 N.E.2d 1156. Second, they are a means of ascertaining the jury's true intentions. *Phillips v. Dayton Power & Light Co.*, 111 Ohio App.3d at 446, 676 N.E.2d 565. Thus, the *Phillips* court reasoned that disregarding inconsistent interrogatories pursuant to *Klever* would thwart the purpose of their use. Id. In addition, the court found the fact that inconsistent interrogatory answers generally mean that one or more of these answers conflict with the general verdict, thereby rendering the integrity of the verdict "even more suspect." Id. The panel concluded: "If we were to apply the holding in *Klever*, we would be commanded to enter judgment on a highly suspect verdict without any means of testing that verdict. We do not think that would be a wise policy." Id. at 447, 676 N.E.2d 565.

{¶ 81}  In concurring with the foregoing reasoning, we hold that Civ.R. 49(B) is applicable to the case before us.  Under Civ.R. 49(B), a judgment cannot be rendered on answers to interrogatories as against a general verdict unless they are inconsistent and irreconcilable.  *Tasin v. SIFCO Industries, Inc.* (1990), 50 Ohio St.3d 102, 105, 553 N.E.2d 257.  Therefore, the trial court had a duty to attempt to harmonize or reconcile Interrogatories H and M, as well as reconcile Interrogatory M with the general verdict.  *Cunningham v. Hildebrand* (2001), 142 Ohio App.3d 218, 224, 755 N.E.2d 384.  The challenging party bears the burden of showing irreconcilability.  *Becker v. BancOhio Natl. Bank* (1985), 17 Ohio St.3d 158, 163, 17 OBR 360, 478 N.E.2d 776; *Fit 'N' Fun Pools, Inc. v. Shelly* (Jan. 3, 2001), Wayne App. No. 99CA0048, 2001 WL 10851.

{¶ 82}  When the jury's answers to one or more interrogatories are irreconcilable with the general verdict, as well as with each other,[1] the choice of whether to enter judgment in conformity with the answers to interrogatories, resubmit the case to a new jury, or to order a new trial is a matter within the sound discretion of the trial court.  *Tasin v. SIFCO Industries, Inc.* 50 Ohio St.3d at paragraph one of the syllabus.  We cannot reverse the trial court's judgment on this issue absent a determination that the trial court's attitude in reaching its decision was an arbitrary, unreasonable, or unconscionable.  *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140.

{¶ 83}  In the present case, we find it noteworthy that the trial court made no effort to reconcile either Interrogatories H and M or to determine whether Interrogatory M was inconsistent and irreconcilable with the general verdict.  The trial judge simply accepted the assertion of inconsistency made by counsel for the Estate.  Further, she failed to recognize that the failure to answer Interrogatory I concerning proximate cause also supported the general verdict and was, therefore, inconsistent with Interrogatory M. Rowe and Simms argue that the trial court's failure to inform the jury "that liability on the part of a specific defendant was a prerequisite to a consideration of punitive damages as to that particular issue" led to the inconsistencies.  However, Rowe and Simms never objected to the jury instructions prior to the time that the jury retired to deliberate.

{¶ 84}  Civ.R. 51(A) provides that, in general, a party may not assign as error on appeal the failure of the trial court to give a jury instruction unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection.  Thus, Rowe and

---

1.  Although not applicable to the case under consideration, the *Phillips* court held that the option of entering judgment on the answers to interrogatories is not available in a case where interrogatories are internally inconsistent.  Id. at 447, 676 N.E.2d 565.

Simms cannot raise the question of any error in the punitive damages instruction on appeal. *Goldfuss v. Davidson* (1997), 79 Ohio St.3d 116, 121, 679 N.E.2d 1099. Moreover, as set forth above, the trial court's instructions on punitive damages, when read as a whole, see *Atkinson v. Internatl. Technegroup, Inc.* (1995), 106 Ohio App.3d 349, 365, 666 N.E.2d 257, encompass the necessity for a prerequisite finding of separate liability for an employer intentional tort and actual damages. In so concluding, we must hold that a finding that Rowe and Simms are not liable for an employer intentional tort is totally irreconcilable with a finding that they are liable for punitive damages.

{¶ 85} Rowe and Simms next argue, and we agree, that in opting to resubmit the interrogatories and general verdict to the jury, the trial court invaded the province of the jury by implying that it came to the wrong decision. See *DeBoer v. Toledo Soccer Partners, Inc.* (1989), 65 Ohio App.3d 251, 258, 583 N.E.2d 1004.

{¶ 86} A court *may* return a case involving interrogatories inconsistent with each other and/or with a general verdict, so long as "* * * the court *only* informs the jurors that their answers to particular interrogatories are in conflict and that they may or may not alter them. The court should also tell the jury that the purpose of interrogatories is to ascertain the jury's true intentions, and that the jury must carefully consider whether the interrogatories in their present form represent those intentions. Furthermore, the court should state that if the interrogatories do represent their intentions, then they should not alter them. However, if the interrogatories do not, then they should conscientiously consider how they could alter them so that they would conform and that they should then revise their interrogatories accordingly." (Emphasis added.) *Phillips v. Dayton Power & Light*, 111 Ohio App.3d at 449, 676 N.E.2d 565.

{¶ 87} Here, the trial judge failed to provide the jury with any of this information. Instead, by stating only that there could be no liability for punitive damages without a finding of liability for the employer intentional tort, she implied that the jury had wrongly decided the intentional tort claim. She then compounded the error by returning the case to the jury a second time, and, without any instruction, to "determine proximate cause." Accordingly, we conclude that the trial court's attitude in opting to return the interrogatories and verdict to the jury for further consideration was an abuse of discretion, that is, was arbitrary. Therefore, Rowe's and Simms' Assignment of Error I is found well taken.

{¶ 88} In making this finding we further conclude that the only viable option in a case such as this one is to remand the claim against Rowe and Simms for a new trial. Consequently, we need not address their Assignments of Error II, III, IV, and V at this time and the same are, hereby, found moot. Because the entire

judgment of the trial court is reversed, the Estate's assignment of error related to an alleged "common law" right to prejudgment interest is also rendered moot.

{¶ 89} The judgments of the Erie County Court of Common Pleas are reversed, and this cause is remanded to that court for further proceedings consistent with this judgment. The Estate of Christopher Dellinger is ordered to pay the costs of this appeal.

Judgment reversed
and cause remanded.

MARK L. PIETRYKOWSKI, P.J., and PETER M. HANDWORK, J., concur.